UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

CIVIL ACTION NO. 3:16-CV-69-GFVT

JOSHUA REECE,                                                                                      PLAINTIFF,


v.                                    **RECOMMENDED DISPOSITION**


SHELBY COUNTY, KENTUCKY, d/b/a
SHELBY COUNTY DETENTION CENTER, *et al.*,                               DEFENDANTS.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the District Court's referral to issue a recommended disposition on the defendants' two motions to exclude certain testimony of plaintiff's expert witness, Nurse Renee Dahring. [R. 176]. The issues being ripe for review, the undersigned recommends that the defendants' motions [R. 153, 157] be GRANTED IN PART AND DENIED IN PART.

## I.    INTRODUCTION

The facts of this case arise from an alleged physical assault on Joshua Reece that he claims was orchestrated by a deputy jailer at the Shelby County jail, which led to an orbital fracture and the subsequent alleged improper treatment by several staff members. [R. 1]. Reece alleges in his complaint that the defendants "knowingly participated or acquiesced in, contributed to, encouraged, implicitly authorized or approved the conduct described below." [*Id.* at ¶ 11]. To help explain the applicable standard of care for medical providers in the correctional context, Reece retained Nurse Dahring as his expert. According to Reece, he retained Nurse Dahring "to review

the medical care provided to [him] by Southern Health Partners and its agents while Reece was incarcerated in the Shelby County Detention Center on shoplifting charges." [R. 184 at p. 1]. Moreover, he intends to use Nurse Dahring's testimony to "explain to the jury the basic standards expected of medical providers in the corrections context and how Southern Health Partners and its employees utterly failed in these basic responsibilities by leaving Joshua Reece in constant pain from obvious skull fractures for a full month." [*Id.* at p. 2]. The defendants now seek to exclude much of her expert opinions. [R. 153, 157]. To understand their motions, the Court will summarize the factual background of this case below.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**<u>Arrest and Jail Incident</u>**:

The chronology of this case begins with Reece's arrest on Wednesday November 18, 2015. [R. 1]. Reece was arrested on this date for shoplifting Fruit Roll-Ups from a Dollar Store in Simpsonville, Kentucky and for a separate shoplifting charge in Jefferson County, Kentucky. [*Id.* at ¶ 3]. He was taken to the Shelby County Detention Center. [*Id.*] Reece alleges that when defendant William Anthony Carey, deputy jailer at Shelby County Detention Center, learned that Reece was being housed at this facility, he orchestrated an attack by ten or more inmates in a maximum-security cell because of Reece's previous relations with Carey's wife. [*Id.* at ¶¶ 13-15]. Reece says he arrived at the jail around 9:00 p.m. on November 18, picked a mat on the floor to go to sleep when he arrived in his cell, and was eventually attacked over the course of several hours during the early hours of November 19. [*Id.*; R. 153-2 at p. 41]. Reece alleges that defendant Christy Bailey, also a deputy jailer, conspired to assist Carey by placing Reece in the maximum-security cell and failing to return to the cell during the shift to check on Reece until several hours

later.[1] [R. 1 at ¶ 16].

**<u>Medical Unit Visits</u>**:

Following this alleged attack, Reece was eventually taken to the medical unit around 11:45 p.m. on November 19. [*Id.* at ¶ 17]. Reece was first seen by defendant Kristy Newton, LPN. [*Id.*] LPN Newton noted that Reece said he was jumped, had lacerations on his head and face, and his eyes were slightly swollen. [*Id.*] She put Reece on "neuro checks" from November 19-20, 2015. [*Id.* at ¶¶ 17-18]. Reece was released and seen again in the medical unit on November 20, 2015 at 11:40 a.m. for an intake medical screening with defendant Heather Neal, LPN. [*Id.* at ¶ 20]. LPN Neal noted that Reece was having issues using the restroom, had a knot on his forehead, had several scratches, bruises on both of his eyes, chest, and upper back, and she prescribed him five days of Ibuprofen. [*Id.* at ¶ 19].

Reece was next seen in the medical unit on November 24, 2015 by defendant Geri McLain, LPN. [*Id.* at ¶ 20]. LPN McClain gave Reece an Admission Data/History and Physical form and she documented that his pupils were "equal" and that he was "red on the [right] side of [his right] eye." [*Id.*] His medical records show that his request was recorded on November 26, 2015, stating "(HEAD HURTS) and (EYE BROKE) NEED X-RAY to Fix my EYE." [*Id.* at ¶ 22]. LPN Neal saw Reece the next day and noted that he had a soft spot above his left eye. [*Id.*] LPN Neal texted Dr. Ronald Waldridge a picture of Reece's injury to ask if he needed X-Rays, but Waldridge ordered an increased dosage of Ibuprofen and to be placed on a list to be seen by Nurse Practitioner Perla on her next visit to the jail. [*Id.*; R. 153-7].

Reece was taken back to the medical unit per security request on December 1, 2015 around

---

1 Carey pled guilty to charges related to this allegation. *See* [R. 153-3 (Minute Entry from Case. No. 3:19-CR-26-GFVT)].

12:30 p.m., so he could get reassurance that he was on the list to see a provider. [R. 1 at ¶ 23; R. 153-8 at p. 16]. Reece was seen by defendant Registered Nurse Heather Lowe, who noted that she "observed bruising around [his] eyes" and assured Reece that he was on the list to see NP Perla. [R. 1 at ¶ 23; R. 153-4 at p. 2]. Reece returned to his cell shortly thereafter. [*Id.*] On December 2, 2015, Reece received a single x-ray of his right eye. [*Id.* at ¶ 24]. The radiologist noted that there was "no radiographic evidence of acute disease" but indicated that "[i]f there is a high clinical index of suspicion, then CT is recommended because it is a more accurate exam." [R. 153-4 at p. 12]. No CT scan was administered. [R. 1 at ¶ 24].

> Reece submitted an information request form on December 5, 2015, writing:
>
> My head and back hurts from getting hit and kicked. Bone above eye really sore. Theirs something wrong. Plus its smashed in that should tell you something[.] [D]id he take x-rays of right eye or something else[?]

[*Id.*] His medical records do not indicate that any action was taken by anyone in the medical department concerning this form. *See* [R. 153-4 at p. 16]. Reece had a follow-up appointment in the medical unit on December 8, 2015, where he saw defendant Christy Coleman, PA concerning Dr. Waldridge's order from November 27. [R. 1 at ¶ 25]. PA Coleman examined Reece and noted that Reece told her that he felt the dent above his right eye, but she told him that the x-ray did not reveal an acute fracture. [*Id.*] PA Coleman also made note that his head was still swollen and both eyes were still brownish/yellow. [*Id.*] In her deposition, PA Coleman stated that she did not order a CT scan at this point because she "did not feel like it was clinically indicated at the time I saw Mr. Reece." [R. 153-9 at p. 39].

On December 15, 2015, Reece was seen by defendant Stacy Jensen, APRN, who made a clinical decision to take another x-ray, which again did not reveal an acute fracture. [R. 1 at ¶ 26].

The radiologist noted that the x-ray revealed again that there was "[n]o evidence of an acute facial fracture[,]" but indicated that there was a "[s]light left-side nasal septal deviation." [R. 153-4 at p. 11]. APRN Jensen prescribed Reece Tylenol 650 to be taken twice a day for five days. [R. 1 at ¶ 26].

**Release from Shelby County Detention Center**:

Reece was released from the Shelby County Detention Center on Friday December 18, 2015 (thirty days from the date of his arrest). [R. 153-2 at p. 104]. The next day Reece went to the Shelbyville hospital where they performed a CT scan. [*Id.* at p. 106-07]. The scan revealed a right orbital fracture and right frontal sinus fracture. [*Id.* at p. 107]. After this was revealed, the hospital referred Reece to the University of Louisville Hospital where he underwent facial reconstructive surgery. [*Id.* at p. 108].

**Complaint Allegations**:

Reece filed his complaint on September 8, 2016. [R. 1]. In relevant part, Reece sued the Shelby County Detention Center, Bobby Waits as the jailer of Shelby County Detention Center, and Christy Bailey for alleged Constitutional violations under 42 U.S.C. § 1983. [*Id.* at ¶¶ 31-38]. He also sued Waits under a theory of supervisory liability, failure to train, and final policy maker liability. [*Id.* at ¶¶ 39-42]. To the medical defendants, Reece sued Dr. Waldridge, APRN Jensen, PA Coleman, LPN Newton, LPN Neal, LPN McClain, and RN Lowe for alleged Constitutional violations pursuant to 42 U.S.C. § 1983 and for state law claims of negligence, gross negligence, and professional negligence. [*Id.* at ¶¶ 31-38, 47-50]. He also sued Dr. Waldridge under a theory of "Supervisor Liability." [*Id.* at ¶¶ 45-46].

**5** of **24**

**Nurse Dahring's Expert Report**:

Based on the allegations in his complaint, Reece seeks to introduce Nurse Dahring as an expert witness to "render opinions regarding the medical care provided by Southern Health Partners for Joshua Reece while he was in the custody of the Shelby County Detention Center." [R. 153-14 at p. 1].

According to her expert report and curriculum vitae, Nurse Dahring is an APRN who oversees corrections medical programs licensed in Minnesota with a Master of Science in nursing. [*Id.* at p. 1, 7]. Nurse Dahring received her BSN from North Dakota State University in 1989 and her MSN from the University of Minnesota in 2000. [*Id.*] She says that she has been a registered nurse for twenty-nine years and has eighteen years of experience in providing care for individuals in correctional settings. [*Id.* at p. 1]. Her experience also includes four years of providing primary care at various prisons in Minnesota and over ten years of experience providing services to detainees in jails. [*Id.*] Nurse Dahring was the lead nurse practitioner for two years and the director of clinical services for two adult facilities and two juvenile correctional facilities. [*Id.*] She has conducted clinical hours for inmates, is a correctional health professional, has spoken at the annual health conference for correctional nurses in Minnesota for the past five years, and has spoken at three national correctional conferences. [*Id.*] Finally, Nurse Dahring has attended the National Commission on Correctional Healthcare, been appointed to the Nurse Advisory Counsel, and is an instructor at the University of Minnesota – Twin Cities. [*Id.*]

To prepare for her report, Nurse Dahring reviewed and relied on the following: (1) Reece's complaint; (2) his medical records; (3) discovery; (4) Edelson's report; (5) the depositions of PA Coleman, LPN McClain, RN Lowe, LPN Neal, LPN Newton, Dr. Waldridge, and APRN Jensen;

(6) Reece's medical records from the University of Louisville School of Dentistry; (7) text messages with photos of Reece; and (8) post-surgical photos of Reece. [*Id.* at p. 2]. Based on her experience and review of these records, Nurse Dahring summarized the findings in her expert report as follows:

1. Mr. Reece was denied access to proper medical treatment when he did not receive timely or appropriate care for the serious injury he sustained while in custody of the Shelby County Jail. His initial evaluation by nursing staff was delayed for almost 20 hours. Eight days after Mr. Reece is injured[,] an X-ray is ordered but is not performed for another 5 days and does not see a provider until an additional 6 days after the X-ray.
2. LPNs Newton, Neal and McClain failed to meet the nursing standards and were negligent when they conducted clinical evaluations that required making clinical decisions that exceeded their training and scope of practice.
3. PA Coleman and APRN Jensen were negligent and indifferent when the care they provided in evaluating and treating Mr. Reece fell below community standards. They failed to take an acceptable history and performed only incomplete and cursory examinations. They were negligent in recognizing clinical indicators for a CT exam and disregarded recommendations made by a radiologist.
4. LPN Newton showed indifference and failed in her duty to protect her patient when after her initial evaluation of Mr. Reece [] she failed to consult with RN, APRN, PA despite Mr. Reece's severe and serious injury. LPN Newton was negligent when she failed to adhere to the policy and performed neuro checks at intervals exceeding the hourly requirement.
5. LPN Neal was negligent in failing to refer Mr. Reece to see a medical provider after identifying significant abnormal findings while completing the Medical Intake Screening.
6. LPN McClain was negligent and failed in her duty to her patient when she failed to consult with or refer Mr. Reece to either the PA or APRN after completing the Admission History and Physical on the very same day as the APRN/PA was onsite and conducting clinic.
7. RN Lowe was negligent and failed in her duty to her patient when she failed to consult or refer to APRN or PA[] who were onsite that very same day she saw Mr. Reece.
8. MD Waldridge was negligent in his role as medical director when he failed to provide oversite for the APRN and PA with whom he directly contracted and assigned to carry out clinical duties in his stead.

[*Id.* at p. 4]. As a basis for these opinions, Nurse Dahring produced the following conclusions and

opinions:

> While in custody[,] Mr. Reece was brutally assaulted and beaten over the course of several hours by approximately 12-14 inmates. He sustained serious head injuries from repeated blow and kicks. Despite the seriousness of his injury[,] he is not sent immediately to an emergency room as would happen in any other setting. Nursing staff is indifferent to his serious medical problem and he is denied access to an appropriate level of care when after 20 hours he is evaluated [] only by an LPN who is not qualified to properly assess or interpret clinical data. Mr. Reece was also denied access to both the APRN or PA who were employed by the medical director and who conducted clinics on a weekly basis solely for the purpose of treating inmates at the Shelby County Detention Center. Nursing staff willfully disregarded Mr. Reece's verbal and written requests for almost 3 weeks until he is scheduled to be seen first by the PA and then a week later by the APRN. Once Mr. Reece is seen by the PA and the APRN, the medical providers recklessly disregarded obvious clinical indicators and Mr. Reece's suffering and choose not to order a CT scan but instead rely on X-rays that have a lower accuracy for imaging the eye socket thus furthering delaying proper care for Mr. Reece.

> The care for Mr. Reece during the month he was in custody at the Shelby County Detention Center fell far below community standards and was delivered by medical personnel who were not qualified to perform the duties they were assigned. Staff kept inaccurate and incomplete notes, received little to no supervision, engaged in poor communication and were permitted to work above their scope of practice. Dr. Waldridge showed neglect when he failed to supervise or review the care provided by the APRN and the PA whom he employed. These actions and conditions created a delay in diagnosing a significant skull fracture during which time Mr. Reece continued to suffer pain and distress. Once diagnosed in the community[,] Mr. Reece undergoes a major reconstructive surgery causing further pain, scarring and distress.

> I hold all my opinions stated above to a reasonable degree of nursing and medical certainty. My opinions are based on the documents I have reviewed[,] and I reserve the right to change my opinions if additional information or documents are provided to me.

[*Id.* at p. 4-5].

### III.    ANALYSIS

There are two pending motions to exclude expert testimony of Nurse Dahring. The first motion was filed by Southern Health Partners, Dr. Waldridge, APRN Jensen, PA Coleman, LPN

McClain, RN Lowe, LPN Neal, and LPN Newton (collectively "SHP defendants"). [R. 153]. The second motion was filed by Shelby County, Kentucky doing business as Shelby County Detention Center, Waits (individually and in his official capacity as Shelby County Jailer), and Bailey (collectively "Shelby County defendants"). [R. 157]. The crux of the defendants' motions is that Nurse Dahring does not meet the admissibility standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579 (1993).

When a party's expert witness is challenged, the District Court assumes the role of a gatekeeper to ensure that the expert witness's testimony is reliable and relevant. *Daubert*, 509 U.S. at 597. Admissibility of expert testimony is governed specifically by Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Sixth Circuit recognizes this language to permit an expert's opinion if the opinion satisfies three requirements. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008). "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *Id.* at 529 (quoting FED.R.EVID. 702). "Second, the testimony must be relevant, meaning that is 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* "Third, the testimony must be reliable." *Id.*

A district court is not required to hold a *Daubert* hearing when neither party requests one and it can perform its gatekeeping function on the basis of the record. *Nelson v. Tennessee Gas*

*Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). The parties do not request a hearing and the record is adequate to decide the motions. Since the SHP defendants and the Shelby County defendants move separately to exclude Nurse Dahring's testimony, this Court will consider the motions to exclude in separate parts below.

### 1. The SHP defendants' motion to exclude certain opinions of Nurse Dahring

The SHP defendants object for different reasons to Nurse Dahring's opinions concerning the actions of Dr. Waldridge, PA Coleman, APRN Jensen, LPN Neal, LPN Newton, LPN McClain, and RN Lowe. [R. 153-1 at p. 11-27]. Accordingly, the Court will address the specific objections below.

#### a. Opinions Concerning Dr. Waldridge's Standard of Care as Medical Director

Nurse Dahring seeks to state the following opinion concerning Dr. Waldridge: he "was negligent in his role as medical director when he failed to provide oversight for the APRN and PA with whom he directly contracted and assigned to carry out clinical duties in his stead." [R. 153-14 at p. 4]. The SHP defendants argue that Nurse Dahring's testimony should be excluded because she is unqualified as she has never served as a medical director and lacks any relevant experience to qualify her. [R. 153-1 at p. 11-14]. Reece argues that Nurse Dahring is qualified to produce such an opinion concerning the evaluation of patients and ordering appropriate testing based on her extensive experience. [R. 184 at p. 9].

Rule 702 requires a proposed expert to have requisite qualifications, whether it be through "knowledge, skill, experience, training, or education." *In re Scrap*, 527 F.3d at 528-29 (quoting FED.R.EVID. 702). This prong of the Rule requires courts to ensure as a threshold matter that the proposed expert is qualified to render his or her opinions. *Id*. This means courts must not consider

"the qualifications of a witness in the *abstract*, but whether those qualifications provide a foundation for a witness to answer a *specific question*." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) (emphasis added). "This requirement has always been treated liberally but, even so, this 'does not mean that a witness is an expert simply because he claims to be.'" *Robinson v. Shelby County, Kentucky*, 2020 WL 1170219, at *1 (E.D. Ky. Mar. 11, 2020) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)).

Reece's argument is unavailing. The parties agree that Nurse Dahring is an APRN, not a doctor or a medical director. Nevertheless, it is still possible that an APRN could obtain the "knowledge, skill, experience, [or] training" required to qualify as an expert on the standard of care required of a doctor supervising PAs and APRNs. To do so, Nurse Dahring could show that she has served in a similar administrative role, and over time she obtained the experience to become qualified to opine on this standard of care. But she has not done this. In fact, Nurse Dahring seems to concede this much in her deposition:

> Q Right. You are not in a position to be able, based on your background and training, to determine whether or not [Dr. Waldridge] is a medical doctor and deviated from the standard of care; correct?
>
> A Correct. He's not a peer of mine.

[R. 153-13 at p. 135].

Reece's reliance on Nurse Dahring's twenty-five years working in corrections, employment as an APRN, experience treating incarcerated patients, and role as a professor teaching students at the University of Minnesota School of Nursing shows that she is qualified in an *abstract* sense, but she has not become qualified in the *specific* sense as is required here. *See Berry*, 25 F.3d at 1351 ("The issue with regard to expert testimony is . . . whether [a witness's]

qualifications provide a foundation for a witness to answer a specific question."). Thus, Nurse Dahring is not qualified to offer an expert opinion on the specific question of the standard of care concerning Dr. Waldridge's role as a medical director. Therefore, it is recommended that Nurse Dahring's opinions concerning the standard of care related to Dr. Waldridge be excluded.

### b.  PA Coleman

Nurse Dahring opines next that PA Coleman was negligent in her evaluation and treatment of Reece and in failing to recognize clinical indicators for a CT exam and disregarded the recommendation of a radiologist. [R. 153-14 at p. 4]. The SHP defendants argue that Nurse Dahring is not qualified to offer such opinions because Coleman is a physician's assistant while Nurse Dahring is an APRN. [R. 153-1 at p. 15-16]. Reece argues that APRNs have advanced training which allows them "to practice independently and perform assessments, prescribe drugs, diagnose and order diagnostic testing." [R. 184 at p. 5].

Reece's argument is again unavailing. The parties do not contest that Nurse Dahring lacks the same credentials as a PA. Instead, the issue turns on whether Nurse Dahring's experience gives her the requisite knowledge, training, or experience to opine about the standard of care applicable to a PA. She has not. Again, it is Reece's burden to show that Nurse Dahring is qualified to render her opinion about the specific standard of care of a PA. *See Berry*, 25 F.3d at 1351.

In her deposition, Nurse Dahring admits that she is not a PA, and explained the difference between an APRN and PA as follows:

> Well, in practice, we're very – very similar for what we can do. The difference is, is that to be an advanced practice nurse of anything – any of the roles, you would have to be a nurse first and then complete a graduate program, no less than a master's degree, to be eligible to sit boards.
> A physician assistant is – they obviously don't have to be a nurse first. And their program is – I think the one here in town is, like, two and a half years. They

> have a – I want to say – a little different relationship in certain circumstances with the physician. Especially here in Minnesota, we don't require collaborative agreements or anything with a physician. But the physician's assistant have to have those.
>
> In practice to the patient, it's not going to appear to be different.

[R. 153-13 at p. 10-11]. When asked about the scope of practice for an APRN in Kentucky compared to a PA in Kentucky, Nurse Dahring said:

> Generally, it's supposed to be within the confines of whatever their collaborating physician – they call them a supervising physician. It's supposed to be in the confines of what the supervising physician does. Because physician's assistants always have to work in relationship to a physician. Whereas, that's not true in all states for nurse practitioners. Some states might require that, but most states don't.

[*Id.* at p. 11]. While the jobs might be similar, Reece has not shown that Nurse Dahring's training, experience, or knowledge as an APRN renders her qualified to answer the specific question concerning the standard of care as it relates to PAs. The relationship and roles of an APRN and PA require a different level of service, namely one that is defined by a collaborating agreement for a PA. Thus, Reece has not shown how Nurse Dahring is qualified to speak to the requisite standard of care because her role and experience as an APRN, by her own admission, requires different training and scope of practice. Therefore, it is recommended that Nurse Dahring's opinions concerning the standard of care related to PA Coleman be excluded.

### c. APRN Jensen

Nurse Dahring offers the same criticisms of APRN Jensen as she did for PA Coleman above. *See* [R. R. 153-14 at p. 4]. This time, however, the SHP defendants do not argue that Nurse Dahring is unqualified to render an opinion to the applicable standard of care. Instead, they argue that her opinion is irrelevant and prejudicial to the defendants. [R. 153-1 at p. 19-20; R. 192 at p. 7-8]. This argument misses the point.

To the extent that the SHP defendants argue that irrelevant evidence must be excluded is correct. *See* FED.R.EVID. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). However, the SHP defendants argue that Nurse Dahring's testimony is irrelevant because there is no evidence of causation or injury to further her claims. [R. 153-1 at p. 20]. The defendants go on to also argue that her testimony should be excluded under the 403-balancing standard from the Federal Rules of Evidence because "any slight probative values . . . is greatly outweighed by the prejudice it would cause the SHP Defendants if it were admitted." [*Id.*]

The issue with the first argument is that Nurse Dahring's testimony is clearly relevant to the standard of care (i.e. should APRN Jenson have sent or recommended that the plaintiff immediately be sent to the hospital for a CT scan following his assault). This testimony goes to the negligence, gross negligence, and professional negligence allegations made in Reece's complaint. [R. 1 at p. 16-17]. Under Kentucky negligence law, including medical negligence, the plaintiff must establish the following elements: (1) duty of care, (2) breach of that duty, (3) causation (actual and proximate), and (4) damages. *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 687-88 (Ky. 2003). To show that element two is met, Kentucky law generally requires an expert to show that the actions of the medical defendant failed to conform to the applicable standard of care. *Blankenship v. Collier*, 302 S.W.3d 665, 670 (Ky. 2010). This is precisely what Nurse Dahring is trying to do, and her testimony is something that will be helpful to the trier of fact to understand the applicable standard of care concerning APRN Jenson's actions. The SHP defendants' objections that Nurse Dahring's testimony does not address or prove the causation and damages elements are not *Daubert* issues before the Court. In other

words, merely because Nurse Dahring is not addressing issues of causation and damages does not preclude her from offering her expert opinion about the standard of care.

To the SHP defendants' argument that Nurse Dahring's testimony is substantially outweighed by the prejudice that would occur if her testimony was permitted, this is also without merit. [R. 153-1 at p. 20]. The SHP defendants argue that a jury could easily confuse Nurse Dahring's testimony about the alleged breach of the standard of care with improper character evidence, causing the jury to be improperly affected. [*Id.*] Rule 403 provides that a "court may exclude relevant evidence if its probative value is *substantially* outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED.R.EVID. 403 (emphasis added). Again, Nurse Dahring's testimony is clearly relevant because it goes to the applicable standard of care. Thus, for evidence to be excluded under Rule 403 (as the SHP defendants allege), the probative value of the evidence must be *substantially* outweighed by the alleged prejudice. *Id.* That is not the case here. The mere fact that Nurse Dahring's expert testimony is clearly unfavorable to APRN Jensen does not render it inadmissible. If that were the case, 403 balancing would kick out all unfavorable evidence. As far as potentially confusing the jury about the issue, the defendants may seek a limiting instruction should this matter proceed to trial. *See* FED.R.EVID. 105 ("If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). Therefore, it is recommended that the SHP defendants' request to exclude Nurse Dahring's testimony as it relates to APRN Jensen be denied.

### d.  LPNs Neal, Newton, and McClain

Nurse Dahring opines that LPNs Newton, Neal and McClain failed to meet the nursing

standards and were negligent when they conducted clinical evaluations that required making

clinical decisions that exceeded their training and scope of practice. [R. 153-14 at p. 4]. To support

this conclusion, Nurse Dahring enumerates the following circumstances:

1. LPN Newton showed indifference and failed in her duty to protect her patient
   when after her initial evaluation of Mr. Reece when she failed to consult with
   RN, APRN, PA despite Mr. Reece's severe and serious injury. LPN Newton
   was negligent when she failed to adhere to the policy and performed neuro
   checks at intervals exceeding the hourly requirement.
2. LPN Neal was negligent in failing to refer Mr. Reece to see a medical provider
   after identifying significant abnormal findings while completing the Medical
   Intake Screening.
3. LPN McClain was negligent and failed in her duty to her patient when she failed
   to consult with or refer Mr. Reece to either the PA or APRN after completing
   the Admission History and Physical on the very same day as the APRN/PA was
   onsite and conducting clinic.

[*Id.*]

The SHP defendants argue that Nurse Dahring has not identified any act or omission to

show that the LPNs violated a standard of care. [R. 153-1 at p. 21-25; R. 192 at p. 8-12]. They

argue that Nurse Dahring's testimony should be excluded because she has not relied upon reliable

methods to reach her conclusion that LPNs Neal, Newton, and McClain breached their standard of

care. [R. 153-1 at p. 23]. Specifically, the SHP defendants argue that her testimony should be

excluded because Nurse Dahring cited "no statute, regulation, industry standard or other support

for her belief employment of LPNs violated the standard of care." [*Id.*]

Reliability is the touchstone of what this Court must decide concerning statements made

by experts. *See Barnette v. Grizzly Processing, LLC*, 2012 WL 293305, at *2 (E.D. Ky. Jan. 31,

2012) ("courts must ensure that an expert's opinion is reliable."). Rule 702 provides several

standards by which a district court in its gatekeeper role is to gauge reliability of expert testimony. A court should look to whether the testimony is based upon "sufficient facts or data;" whether it is the "product of reliable principles and methods;" and whether the expert "has applied these principles or methods reliably to the facts of the case." *In re Scrap Metal*, 527 F.3d at 529 (quoting FED.R.EVID. 702). The reliability inquiry is a flexible one, and the above factors are not a "definitive checklist or test." *Daubert*, 509 U.S. at 593.

The exclusion of Nurse Dahring's testimony on the reliability ground is unwarranted. Nurse Dahring says an LPN's role is to gather information from the patient and then contact someone at a higher level of training to get direction on what to do. [R. 153-13 at p. 59, 65]. Reece says Nurse Dahring's criticisms of the LPNs does not fault them for failing to diagnose the skull fracture or order a CT scan (recognizing that is for a medical official with a higher level of training to decide), but instead faults them for not recognizing that he needed to be seen by an official with a higher level of training. [R. 184 at p. 9]. Based on this, she concludes that LPNs Newton, Neal, and McClain exceeded their role when they failed to consult with RNs, APRNs, or PAs after meeting with Reece. [R. 153-14 at p. 4].

The SHP defendants' objection to Nurse Dahring's conclusion seems to go more to the credibility and weight of her testimony rather than its admissibility. *See United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (challenges to the accuracy of an expert's conclusions or factual basis generally "bear on the weight of the evidence rather than on its admissibility."). Thus, the proper means of attacking this testimony is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Thus, Nurse Dahring's testimony is sufficiently reliable and will not be excluded as

unreliable.

To the extent that the SHP defendants argue that Nurse Dahring's testimony should be excluded for being irrelevant and unduly prejudicial, it fails for the same reasons outlined above in 1.c above. Therefore, it is recommended that the SHP defendants' request to exclude Nurse Dahring's testimony as it relates to LPNs Neal, Newton, and McClain be denied.

### e.   RN Lowe

Finally, Nurse Dahring opines that "RN Lowe was negligent and failed in her duty to her patient when she failed to consult or refer to APRN or PA[] who were onsite that very same day she saw Mr. Reece." [R. 153-14 at p. 4]. RN Lowe saw Reece on December 1, 2015, and she noted that she "observed bruising around [his] eyes" and reminded Reece that he was on the list to see NP Perla. [R. 1 at ¶ 23]. Thus, based upon RN Lowe's view of Reece, it is Nurse Dahring's opinion that she should have consulted or referred him to an APRN or PA.[*Id.*] The SHP defendants argue that this testimony must be excluded because it is based upon speculation about whether a provider was on site that date at the time she saw Reece. [R. 153-1 at p. 25; R. 192 at p. 12-14].

The question here is whether Nurse Dahring relied upon sufficient facts or evidence to support her opinion that RN Lowe was negligent for not consulting or referring Reece to an APRN or PA. To show that she has not, the SHP defendants rely on Nurse Dahring's deposition where she indicated that she believed a provider was on-site on December 1, 2015. *See* [R. 153-13 at p. 81]. When pressed on her knowledge of whether a provider was on-site, the following was elicited:

> Q I know that typically I think that [a provider was] there on a specific day. But like you, the testimony is their dates were flexible.
> So have you seen any time records that indicate for certain that there was a provider on site that day?
>
> A No. I've only seen what they said they did in their depositions.

Q And as with you, I know the providers come at different times during the day and they were there for a certain period of time, often two to four hours, kind of like you. Once again, without time records, you wouldn't know at what point in time Mr. Reece was brought up to medical and whether there was actually a provider on site at that moment, would you?

A No, I've not seen the time records.

Q Okay. Alright. And once again, with respect to whether there was a provider there or not, there were orders that had been entered by Dr. Waldridge for the Ibuprofen for seven days, and he was on the fifth day of that, and put him on the provider list, which he was. Other than that, what would Nurse Lowe have been obligated to do?

A Again, I was going by the depositions and the testimony that I received that the provider was on site.

Q Okay. Well, and I think that the records will show what they show. But regardless of whether or not the provider was on site that day, is it possible that Mr. Reece wasn't brought up to security – by security until after the provider was gone, right?

A I suppose that's possible, yes. I don't recall – I don't know if there was a time stamp on the entry.

[*Id.* at p. 81-82].

Expert testimony is not reliable if it is based upon speculation. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("no matter how good experts' credentials' may be, they are not permitted to speculate"); *see also Daubert*, 509 U.S. at 590) (the word "knowledge" connotes more than subjective belief or unsupported speculation"). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In Scrap Metal*, 527 F.3d at 529-30.

The SHP defendants' speculation argument is unfounded. Like with the other SHP

defendants, the crux of Nurse Dahring's opinion focuses on the breach of a standard of care when RN Lowe failed to act (meaning she failed to consult with or refer Reece to an APRN or PA) after she saw Reece. *See* [R. 153-14 at p. 4-5 ("The care for Mr. Reece during the month he was in custody at the Shelby County Detention Center fell far below community standards . . . [the] [s]taff kept inaccurate and incomplete notes, received little to no supervision, engaged in poor communication and were permitted to work above their scope of practice."). The foundation of Nurse Dahring's opinion rests on her finding that Reece was taken to RN Lowe on December 1, 2015, after she observed Reece's injury, noted his complaint concerning his eye, and noted that he was in an altercation that caused his injury. [*Id.*; R. 153-4 at p. 2]. Under these circumstances, Nurse Dahring finds there was a breach of the standard of care in not consulting or referring Reece to the APRN or PA, whom she also believed was there during Reece's visit. [R. 153-14 at p. 4]. Accordingly, Nurse Dahring's conclusion that RN Lowe's actions were unreasonable under the circumstances are supported by her belief that a provider was on site and available when Reece was seen by her. [*Id.*] But it is ultimately her failure to consult or refer Reece to the provider after she saw him that Nurse Dahring opines makes RN Lowe's actions unreasonable. Thus, Nurse Dahring's failure to know whether a provider was on site goes again to the credibility and weight of her testimony (concerning the reasonableness of her actions under the circumstances) rather than wholesale exclusion. *See L.E. Cooke Co.*, 991 F.2d at 342. The proper means of attacking this testimony is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Therefore, Nurse Dahring's testimony is sufficiently reliable and will not be excluded as unreliable.

　　　To the extent that the SHP defendants argue that Nurse Dahring's testimony should be

excluded for being irrelevant (because Nurse Dahring has offered no evidence of causation or injury) and unduly prejudicial (under Rule 403), it fails for the same reasons outlined above in 1.c above. Therefore, it is recommended that the SHP defendant's request to exclude Nurse Dahring's testimony concerning RN Lowe be denied.

### 2. Shelby County Detention Center, Bobby Waits, and Christy Bailey's motion to exclude certain opinions of Nurse Dahring

The Shelby County defendants also move to exclude testimony of Nurse Dahring concerning the following opinions: (1) despite the seriousness of his injury, Reece is not sent immediately to an emergency room as would happen in any other setting; (2) the care for Reece during the month he was in custody at Shelby County Detention Center fell far below the community standards; and (3) these actions and conditions created a delay in diagnosing a significant skull fracture during which time Reece continued to suffer pain and distress. [R. 157 at p. 3, R. 157-1 at p. 4-5]. Reece did not respond to the Shelby County defendants' motion.

To the first two statements, the Shelby County defendants argue that Nurse Dahring is unqualified to offer a critical opinion about the Shelby County Detention Center as it relates to sending Reece to the emergency room and the allegation that the care he received at Shelby County Detention Center fell far below the community standard of care required. [R. 157 at p. 4]. The Shelby County defendants concede that it appears that Nurse Dahring is only opining about the medical care and treatment as it relates to the SHP defendants in her expert report. [*Id.* at p. 5]. However, they note their concerns come from reading Nurse Dahring's expert report in conjunction with her deposition testimony:

> Q And as I have understood your most recent testimony, you are of the belief that there is sort of a general delay in treatment for Mr. Reece, but you are unable to attribute it, in whole or in part, to any individual

defendant; is that correct?

A I would say that's correct. I think they *all* had a part in it.

[*Id.*; R. 157-2] (emphasis added).

To the degree that Nurse Dahring's testimony can be read as opining the Shelby County defendants played a part in delaying Reece's care, the defendants argue that she has neither reviewed any policy at the Shelby County Center to qualify her opinion, nor has she based her opinion upon a qualified correctional or custodial methodology. [R. 157 at p. 4]. Reece does not contest this assertion. There is no question that Nurse Dahring is unqualified to render such opinions about the Shelby County defendants as Reece has made no attempt to show that she is qualified to render this specific criticism about them. *See In re Scrap*, 527 F.3d at 528-29 (quoting FED.R.EVID. 702); *see also Berry*, 25 F.3d at 1351. The only documents Nurse Dahring reviewed to render her expert report were the complaint, Reece's medical records, discovery of Bowling, Edelson's report, the depositions of PA Coleman, LPNs McClain, Neal, and Newton, RN Lowe, APRN Jensen, and Dr. Waldridge, Reece's medical records from the University of Louisville, the text message with photographs of Reece, and his post-surgical photographs. *See* [R. 157-1 at p. 2]. Thus, it is recommended that she not be permitted to render these opinions about the Shelby County defendants should this matter proceed to trial.

To the last statement, the Shelby County defendants argue that there is no evidence to support that the Shelby County Detention Center, Waits, or Bailey were involved in delaying medical treatment for Reece. [R. 157 at p. 5]. In her expert report, Nurse Dahring summarized her findings as follows:

Mr. Reece was denied access to proper medical treatment when he did not receive timely or appropriate care for the serious injury he sustained while in the custody

of the Shelby County Jail. His initial evaluation by nursing staff was delayed for almost 20 hours. Eight days after Mr. Reece is injured[,] an X-ray is ordered but is not performed for another 5 days and does not see a provider until an additional 6 days after the X-ray.

[R. 157-1 at p. 4]. The Shelby County defendants argue that Nurse Dahring conceded they were not involved in her deposition by admitting that Reece did not fill out a jail medical request until November 26, 2015 (one week after the incident). [R. 157 at p. 5]. Reece again does not contest this argument. Without a sufficient foundation to render her opinion, Nurse Dahring's testimony concerning the Shelby County defendants' involvement in Reece's delayed medical attention must also be excluded. *See* FED.R.EVID. 702 (expert testimony must be based on sufficient underlying "facts or data"). Therefore, it is recommended that the Shelby County defendants' motion to exclude be granted.

## IV.    RECOMMENDATION

Therefore, having considered the record and being advised,

IT IS RECOMMENDED that:

1.  The defendants' motion to exclude testimony of Renee Dahring [R. 153] be GRANTED IN PART AND DENIED IN PART as follows:

    a.  GRANTED concerning opinions about the standard of care as it relates to Dr. Waldridge and PA Coleman; and

    b.  DENIED concerning opinions about the standard of care as it relates to APRN Jensen; LPNs Neal, Newton, and McClain; and RN Lowe.

2.  The defendants' motion to exclude testimony of Renee Dahring [R. 157] be GRANTED.

\*\*\* \*\*\* \*\*\* \*\*\*

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed with the Clerk of the Court within fourteen days of the date of service or further appeal is waived. FED. R. CIV. P. 72(b)(2); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of written and specific objections. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are not sufficient to preserve the right of appeal. *Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991). A party may respond to another party's objections within fourteen days of being served with a copy of those objections. FED. R. CIV. P. 72(b)(2).

Signed July 1, 2020.



**Signed By:**

*Edward B. Atkins*

**United States Magistrate Judge**