UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| JOSHUA REECE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:16-cv-00069-GFVT-EBA |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| SHELBY COUNTY, KENTUCKY, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

In November 2015, Plaintiff Joshua Reece was assaulted by fellow inmates within the

Shelby County Detention Center in Shelbyville, Kentucky. After being discharged from the jail,

Mr. Reece brought suit against a number of defendants claiming multiple state law violations and

constitutional violations under 42 U.S.C. § 1983. Pending before the Court are three separate

motions for summary judgment. Shelby County Defendants[1] and Southern Health Partners, Inc.

Defendants[2] move for summary judgment on all Plaintiff's claims against them [R. 152; R. 156],

and Mr. Reece moves for summary judgment against Defendant Deputy Jailer William Carey.

[R. 155.] For the reasons that follow, both the Shelby County Defendants and Southern

Defendants' motions are **GRANTED in part** and **DENIED in part**, and Mr. Reece's motion is

also **GRANTED in part** and **DENIED in part**.

---

[1] Defendants Shelby County, Kentucky d/b/a Shelby County Detention Center; Bobby Waits, individually and in his official capacity as Shelby County Jailer; and Christy Bailey are collectively referred to as the Shelby County Defendants. [*See* R. 157 at 1.]

[2] Defendants Southern Health Partners, Inc., Ronald Waldridge, M.D., Stacy Jensen, APRN, Christy Coleman, PA, Geri McClain, Heather Lowe, Heather Neal, and Kristen Newton, are collectively referred to as the Southern Defendants. [*See* R. 201 at 1.]

# I

## A

On November 18, 2015, Joshua Reece was arrested for shoplifting and taken to the Shelby County Detention Center to await court proceedings.  [R. 1 at ¶ 3; R. 155-1 at 2–3.] Deputy Jailer William Anthony Carey was working at the jail when Mr. Reece arrived and recognized Mr. Reece as the ex-boyfriend of his wife.  [R. 179 at 1; R. 155-4 at 8.]  At booking, Deputy Jailer Christy Bailey classified Mr. Reece as a minimum-security inmate and, after a brief consultation with Mr. Carey, placed Mr. Reece in Cell 317, a minimum-security cell.  [R. 155-1 at 5; R. 156-1 at 4.]

According to Mr. Reece, he was awoken around 2:00 a.m. the next morning by several other inmates, including inmate Corey Hopper, who proceeded to assault him over the course of several hours.  [R. 1 at ¶ 15.]  Mr. Reece claims the assault was orchestrated by Mr. Carey, that other jail officials were responsible for allowing it to happen, and that he received inadequate medical care from the jail's health care service provider, Southern Health Partners, after the assault.  [R. 1 at ¶¶ 15–26; R. 187-1.]  To fully address the parties' motions, a brief overview of the health care arrangement at the jail and the medical care provided to Mr. Reece is necessary.

Shelby County contracted with Southern to serve as the health care service provider at the jail, which subcontracted with Dr. Ronald Waldridge, M.D., to serve as medical director.  [R. 187-4.]  Dr. Waldridge then contracted with APRN Stacy Jensen and PA Christy Coleman to provide clinical services at the jail.  Four nurses were also employed by Southern to work at the jail: RN Heather Lowe, and LPNs Kristen Newton, Heather Neal and Geri McClain.  [R. 152-1 at 1–2.]

As noted, Mr. Reece alleges he was assaulted in the early morning hours of November 19, 2015.  [R. 1 at ¶¶ 16–17.]  His injuries were not discovered until later that evening; jail

records indicate that Mr. Reece was brought to medical around 11:00 p.m. that night.  [R. 152-4 at 3.]  Beginning with that initial visit, Mr. Reece was seen on seven different occasions by six different medical providers over the next four weeks—from November 19 to December 15.[3] [*See* R. 152-4.]  Throughout, Mr. Reece experienced pain in his face and head area and exhibited certain other neurological symptoms.  [*Id.*; *see also* R. 188-35.]  He received two facial X-rays but never a CT scan.  *Id.*  During his four-week stay, Mr. Reece was never diagnosed with a facial fracture and never sent out of the jail for outside medical attention.  [*See* R. 152-4.]

On December 18, Mr. Reece was released from the jail.  On December 19 he went to a hospital in Shelbyville due to continued concern with "the dent in [his] head" and "the blood in [his] throat."  [R. 188-6 at 107.]  Mr. Reece received a CT scan at that time which revealed a "right frontal sinus fracture and a right superior orbital rim fracture."  [R. 157-1 at 4; R. 188-36 at 6.]  Hospital personnel referred Mr. Reece to the University of Louisville where, on December 23, he underwent facial reconstructive surgery to repair the fractures.[4]  [R. 188-37 at 2–3.]

Multiple lawsuits followed.  In January 2016, a criminal complaint was filed against Mr. Carey in Shelby County District Court for his involvement in the assault of Mr. Reece. [R. 155-1 at 8–9; R. 155-28 at 1.]  Shortly thereafter, Mr. Carey entered a guilty plea to official misconduct in the first degree and complicity to assault in the fourth degree and was convicted accordingly. [R. 155-1 at 9; R. 35-2 at 7.]  In September 2016, Mr. Reece brought the present civil suit.  [R. 1.]  During the pendency of the suit, in the spring of 2019, the United States Attorney brought a

---

[3] The medical care provided by each provider will be detailed more fully below, when analyzing the claims against each provider.  *See infra* Section II.B.2.b.

[4] After the surgery, Mr. Reece was referred by his attorney to a neuropsychologist, Dr. Richard Edelson, Ph.D, ABN, who diagnosed Mr. Reece as suffering from a traumatic brain injury, post-concussive headaches, severe major depressive disorder with psychotic features, and posttraumatic stress disorder. [R. 188-38 at 1.]  Dr. Edelson opined further that "[w]ithin the realm of neuropsychological probability," he believed these problems stemmed from the November 2015 assault at the jail.  *Id.* at 2.

criminal action against Mr. Carey for his role in the November 2015 assault, charging Mr. Carey with one count of deprivation of rights under color of law, in violation 18 U.S.C. § 242.  [R. 6, *United States v. William Anthony Carey*, 3:19-cr-00026-GFVT.]  Mr. Carey pled guilty to that charge and on August 17, 2020 this Court sentenced him to four years of incarceration.[5]  [R. 7; R. 10; R. 41, *Carey*, 3:19-cr-00026-GFVT.]

In his civil complaint, Mr. Reece alleges violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments under Count I, actionable under 42 U.S.C. § 1983.  [R. 1 at ¶¶ 31–46.]  Additionally, against the individual Defendants and Southern, Mr. Reece brought claims for negligence, gross negligence, and professional negligence (Count II); intentional infliction of emotional distress (Count III); and conspiracy to violate constitutional rights under 42 U.S.C. § 1985 (Count IV).  [R. 1 at ¶¶ 47–56.]  Shelby County Defendants and Southern Defendants move for summary judgment, arguing there are no genuine issues of material fact regarding any of Mr. Reece's claims against them.  [R. 152 at 1; R. 156-1 at 14.]  Mr. Reece moves for summary judgment as to his claims against Defendant Carey, arguing Carey has already admitted "to all issues of fact necessary to establish liability."  [R. 155 at 1.]

**B**

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corporation of the President of the Church*, 521 F.

---

[5] Mr. Carey's sentencing was continued multiple times in light of other ongoing, closely related criminal proceedings.  [*See* R. 21, *United States v. William Anthony Carey*, 3:19-cr-00026-GFVT.]

Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying the parts of the record that establish absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. Once the movant has satisfied its burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Hall Holding*, 285 F.3d at 424 (internal citations omitted).

When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Liberty Lobby*, 477 U.S. at 255). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id*.

**II**

**A**

Mr. Reece brings a multitude of federal and state claims against the various Defendants. [R. 1.]  The Court has already determined many of these claims are without merit, dismissing Mr. Reece's Fourth, Fifth, and Eighth Amendment claims given their inapplicability in the present context.  [*See* R. 65 at 17.]  Mr. Reece's civil conspiracy claims, alleging a violation of 42 U.S.C. § 1985 "against all individual Defendants and [Southern]," are similarly suspect.  [R. 1 at ¶¶ 54–56.]  Before proceeding further, the Court will address whether the various Defendants are entitled to summary judgment on these claims, set forth in Count IV of the Complaint.  *See id.*

**1**

To state a § 1985 claim, a plaintiff must prove: "(1) the existence of a conspiracy; (2) the purpose of the conspiracy was to deprive any person or class of persons the equal protection or equal privileges and immunities of the law; (3) an act in furtherance of the conspiracy; and (4) injury or deprivation of a federally protected right." *Royal Oak Entertainment, LLC v. City of Royal Oak, Michigan*, 205 F. App'x 389, 399 (6th Cir. 2006). "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).  Because direct evidence of an express agreement among co-conspirators is rare, "circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (internal quotations and citation omitted).

On his conspiracy claims, Mr. Reece alleges that he "suffered serious harm because of a conspiracy between Carey, [Christy] Bailey and Unknown Defendants to have him beaten by

6

other inmates . . . ."  [R. 1 at ¶ 55.]  Mr. Reece further alleges that the "remaining individual Defendants and Southern were, willingly or unwillingly, made part of Carey and Bailey's conspiracy to violate Reece's common-law and constitutional rights."  *Id.*

### a

Defendant Bailey and Defendant Waits move for summary judgment on this count, arguing "Plaintiff's allegations are merely conclusory and do not support such action."  [R. 156-1 at 28.]  In response, Mr. Reece argues there are "disputed issues of fact . . . on whether Carey and Bailey engaged in a conspiracy to deny Reece his constitutional rights."  [R. 182-1 at 41.]

As an initial matter, it appears Mr. Reece does not dispute that Defendant Waits is entitled to summary judgment on this claim.  His response focuses solely on whether Bailey was part of a conspiracy and, further, the Court is aware of no evidence that implicates Defendant Waits on this claim.  [*See* R. 182-1 at 41.]  As such, the Court grants summary judgment to Defendant Bobby Waits as to Count IV.

### b

There is a similar lack of evidence to support a conspiracy claim against Ms. Bailey.  In his attempt to create a disputed issue of material fact on whether a conspiracy existed, Mr. Reece argues the Court should infer that Mr. Carey told Ms. Bailey about his intent to have Mr. Reece assaulted based on *Carey's* invocation of the Fifth Amendment when questioned on the matter. [R. 182-1 at 21, 41.]  But such an inference is improper in this instance.

The Fifth Amendment permits adverse inferences against parties in civil cases "when they refuse to testify *in response to probative evidence offered against them*." *Lawrence v. Madison Cty.*, 176 F. Supp. 3d 650, 663 (E.D. Ky. 2016), *aff'd sub nom. Lawrence for Estate of Hoffman v. Madison Cty.*, 695 F. App'x 930 (6th Cir. 2017) (citing *Baxter v. Palmigiano,* 425

7

U.S. 308, 318 (1976)) (emphasis in original).  For present purposes, probative evidence would be evidence that indicated Ms. Bailey was aware of or supported Mr. Carey's scheme.

Mr. Reece points to two actions taken that night to support the inference that Ms. Bailey was aware of Mr. Reece's scheme: (1) Ms. Bailey sought Carey's advice on where to house Mr. Reece, and (2) "while Bailey normally took an inmate to the cell after the booking process was complete, with Reece, Carey personally took him."  [R. 182-1 at 23; *see also* R. 65 at 16.]  These actions do not amount to probative evidence on this issue.  First, the contention that it was atypical for Mr. Carey to take Mr. Reece to his cell while Ms. Bailey was booking inmates is, quite simply, a mischaracterization of the record.  [R. 182-1 at 23 (citing R. 188-3 at 36).] When questioned on who "would actually walk the inmate to the cell" after booking, Ms. Bailey responded as follows: "If I was out there and not booking anybody else in, I would, or if there's a deputy that was close by, they could walk them to the cell."  [R. 188-3 at 36.]  Second, the record reflects that Ms. Bailey regularly sought this type of input from other colleagues when performing inmate intake.  [*See* R. 150 at 13 ("[T]here would usually be a deputy there that had more experience than I did.  If I had any questions, I could ask them.").]  To infer that Ms. Bailey conspired to harm Mr. Reece based on these actions requires a speculative leap that the Court declines to make. [6]

Reasonable inferences are permitted in certain circumstances, but pure speculation is not. Mr. Reece has failed to allege facts sufficient to indicate "any sort of 'meeting of the minds' or to link any of the alleged conspirators in a conspiracy to deprive him of his civil rights."  *See Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008).  Accordingly, the Court grants summary judgment to Defendant Bailey as to Count IV.

---

[6] Based on this finding, at this point, the Court need not address the disagreement over whether Carey's invocation of his Fifth Amendment privilege can be used against Ms. Carey.  [*See* R. 197; R. 199.]

**2**

As noted, Mr. Reece also brought § 1985 claims against the individual Southern Defendants and Southern itself.  [R. 1 at ¶ 55 ("The remaining individual Defendants and Southern were, willingly or unwillingly, made part of Carey and Bailey's conspiracy to violate Reece's common-law and constitutional rights.").  However, in their motion for summary judgment seeking to dismiss all Mr. Reece's claims against them, Southern Defendants initially failed to directly address this claim.  As such, the Court provided Southern Defendants an additional opportunity to address these claims by filing a supplemental memorandum.  [*See* R. 222.]  Southern Defendants did so and argued the individual Defendants and Southern itself were entitled to judgment as a matter of law.  [R. 224 at 7.]  In response, Mr. Reece agreed to dismiss this claim.  [R. 225 at 1 n. 1.]  Accordingly, the Court grants summary judgment to the Southern Defendants as to Count IV.

**B**

Mr. Reece brings various § 1983 claims against Southern Defendants and Shelby County Defendants.  [R. 1 at ¶¶ 31–46.]  Section 1983 does not create substantive rights but rather "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States . . . ." *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 924 (1982).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988).  "The first step in any such claim is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citations omitted)).

Having already dismissed Mr. Reece's Fourth, Fifth, and Eighth Amendments claims, the Court need only address Mr. Reece's Fourteenth Amendment claims.  [*See* R. 65 at 6–8.]  Mr. Reece's Fourteenth Amendment claims are based on the following theories: failure to provide adequate medical care, failure to protect, supervisory liability, and municipal liability.  [R. 1 at ¶¶ 33–46.]  The Court will first analyze the "failure to provide adequate medical care" claims.

1

The Fourteenth Amendment affords pretrial detainees "a right to adequate medical treatment . . . ."  *Harbin v. City of Detroit,* 147 F. App'x 566, 569 (6th Cir. 2005) (citing *Weaver v. Shadoan,* 340 F.3d 398, 410 (6th Cir. 2003)).  And, until recently, it is was well-established that pretrial detainee's Fourteenth Amendment rights were "analogous to the Eighth Amendment rights of prisoners."  *Id.*; *see also Vaughn v. City of Lebanon,* 18 F. App'x 252, 272 (6th Cir. 2001) (citation omitted).  As this Court has previously explained, that is no longer the case—the Supreme Court signaled in *Kingsley* that this universal test for both pretrial detainees and convicted prisoners' claims was misguided.  *See Love v. Franklin Cty., Kentucky,* 376 F. Supp. 3d 740, 744 (E.D. Ky. 2019) (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).

Previously, plaintiffs were required to show: (i) an objectively substantial risk of serious harm, and (ii) that the jail or county officials were "subjectively aware of the risk."  *Harbin v. City of Detroit*, 147 F. App'x 566, 570 (6th Cir. 2005).  The *Kingsley* holding suggests that pretrial detainees no longer need to prove that the defendant had actual knowledge to succeed on the second prong of the deliberate indifference test.  *Kingsley*, 576 U.S. at 397; *cf. Griffith v. Franklin Cty., Kentucky*, 975 F.3d 554, 570 (6th Cir. 2020) (citations omitted) (reserving "for another day" the question whether, following *Kingsley*, the objective test now governs in

10

"conditions-of-confinement claims brought under the Fourteenth Amendment.").  Now, a pretrial

detainee need only show that the defendants "recklessly failed to act with reasonable care to

mitigate the risk that the condition posed to the pretrial detainee even though the defendant-

official knew, or should have known, that the condition posed an excessive risk to health or

safety."  *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018); *see also Castro v.

County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016); *Miranda v. County of Lake*, 900

F.3d 335, 351 (7th Cir. 2018).  That is, a pretrial detainee-plaintiff need not prove the

defendant's mindset and instead can succeed by pointing only to objective facts.

Importantly, the *Kingsley* holding has implications on all pretrial detainee's claims,

including "right to adequate medical treatment" claims.  *Love*, 376 F. Supp. at 744; *see also

Richmond v. Huq*, 885 F.3d 928, 938 n. 3 (6th Cir. 2018).  Following *Kingsley*, to succeed on

such a claim, a pretrial-detainee plaintiff must show that (1) he or she suffered a serious medical

condition and (2) that defendants were deliberately indifferent, as defined by the objective

standard above.  *Bruno*, 727 F. App'x at 720.

**2**

The Court turns first to Mr. Reece's failure to provide adequate medical care claims as

brought against the Southern Defendants.[7]  As set forth in the factual history above, several

providers attended to Mr. Reece during his ill-fated stay at the Shelby County jail.  Each

Southern Defendant now moves for summary judgment on this § 1983 claim, arguing that (1)

they are entitled to qualified official immunity or, in the alternative, (2) Mr. Reece has failed to

provide evidence sufficient to establish deliberate indifference as to each Southern Defendant.

---

[7] As noted above, in addition to Southern itself, there are seven individual Defendants that comprise the
Southern Defendants: Ronald Waldridge, M.D., Stacy Jensen, APRN, Christy Coleman, PA, LPNs Geri
McClain, Heather Neal, and Kristen Newton, and RN Heather Lowe.  [*See* R. 201 at 1.]

**a**

Southern Defendants' qualified official immunity argument is imprecise and, as it relates to the § 1983 claims, unavailing.  Southern Defendants argue the seven individual providers "are protected from liability by qualified official immunity and are entitled to judgment as a matter of law." [R. 152-1 at 9.]  They then go on to cite Kentucky case law which sets out the standard for *state law* immunity from *state law* claims in support of their qualified official immunity position. *Id.* at 9–23 (relying heavily on *Jerauld v. Kroger*, 353 S.W.3d 636 (Ky App. 2011)).  There are two issues with this line of argument.

First, it appears Defendants believe that if state law immunity applies, they are entitled to judgment as a matter of law on all claims against them—federal claims included.[8]  [*See* R. 152-1 at 23 ("In the extent [sic] that the Court does not dismiss Plaintiff's claims against Defendants Waldridge, Coleman, Jensen, Lowe, McClain, Neal and Newton in their entirety on the basis of qualified official immunity, they are entitled to judgment on Plaintiff's "deliberate indifference" claim because . . .").]  Of course, state law immunity has no bearing on liability under § 1983. Federal law controls when determining whether an individual is immune from § 1983 liability. *See Martinez v. California*, 444 U.S. 277, 284 n. 8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law.  A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise . . . ."); *see also Savage v. City of Pontiac*, 743 F. Supp. 2d 678, 689 (E.D. Mich. 2010), *aff'd*, 483 F. App'x 943 (6th Cir. 2012).  So, at most, the Southern Defendants are immune from liability on the state law claims brought against them.

---

[8] Nowhere in the fourteen pages of argument on state law immunity do Defendants specify that the doctrine only applies to Mr. Reece's state law claims.

This is where the second issue comes into play. As Mr. Reece points out, it is unclear whether the Southern Defendants, as non-governmental actors, are entitled to immunity under Kentucky law. [R. 183 at 31 (citing *Rice v. Montgomery Cty., Kentucky*, No. CV 5:14-181-KKC, 2016 WL 2596035, at *18 (E.D. Ky. May 5, 2016)).] This issue will be analyzed more fully below, when considering whether Southern Defendants are entitled to summary judgment on Mr. Reece's state law claims. For now, the Court's focus remains on whether Southern Defendants are entitled to summary judgment on Mr. Reece's § 1983 claims—claims on which state law immunity has no bearing.

**b**

Southern Defendants next claim they are entitled to summary judgment on the ground that Mr. Reece has failed to provide sufficient evidence to support his "right to adequate medical treatment" claim.[9] As stated above, to succeed on such a claim Mr. Reece must show (1) he suffered a serious medical condition and (2) that Defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." B*runo*, 727 F. App'x at 720. The care provided by each medical professional will be considered in turn. Based on the injuries reflected in his medical records, Mr. Reece easily satisfies the first element of his claim—that he suffered from a serious medical condition during his incarceration. [R. 153-14 at 4; R. 188-36 at 6.] Accordingly, for each Defendant, the question is whether Mr. Reece can point to sufficient evidence on the second element.

---

[9] Southern Defendants "maintain that proof of subjective intent is still required in a medical needs deliberate indifference claim such as this one." [R. 152-1 at 23.] This argument is well taken but, as Defendants acknowledge, this Court has already analyzed this issue fully and concluded otherwise. *See Love*, 376 F. Supp. 3d at 744.

13

**i**

First, LPN Kristen Newton.  LPN Newton attended to Mr. Reece on the night of the assault and was the first medical professional to provide care.  [R. 152-4 at 3.]  At that time, she noted lacerations and swelling on Mr. Reece's head and placed him on hourly "neuro checks" but did nothing further—notably, she did not consult with another medical provider concerning his injuries.  [R. 152-4 at 3.]  Although Mr. Reece claims LPN Newton stated he "needed to go to the hospital," he was never sent.  [R. 187-9 at 76.]  Mr. Reece argues that "Newton's repeated failures to secure medical treatment for Reece constitute deliberate indifference."  [R. 183 at 21.]  LPN Newton, however, claims she is entitled to summary judgment on this claim because Mr. Reece "has no proof that Nurse Newton acted with deliberate indifference" because she "took a history, conducted a physical examination and applied the criteria set forth in the clinal pathways . . . ."  [R. 152-1 at 46.]

LPN Newton is not entitled to summary judgment on this claim.  To start, a reasonable jury could conclude LPN Newton should have known that Mr. Reece had a condition that posed an excessive risk to his health.  In fact, in placing Mr. Reece on hourly neuro checks, it appears LPN Newton recognized the possibility that he suffered a head injury.  [*See* R. 187-3 at 9 (Defendants' expert noting that the purpose of hourly neuro checks is to "make sure [an inmate's] neurological status doesn't change.  It's very common to do after a head trauma.").]  Even so, she failed to inquire whether Mr. Reece lost consciousness during the assault or had blurred vision afterwards—both inquiries she should have made at that point to determine the seriousness of Mr. Reece's injuries, according to Defendants' expert.  [*See* R. 187-3 at 21–24.]

Most concerning, however, was LPN Newton's failure to notice the indentation on Mr. Reece's forehead.  The deputy jailer who first removed Mr. Reece from his cell following the

assault noted the "indention on his face" at that time.[10]  [R. 193-1 at 2.]  So, even to a layperson,

the indentation—a clinical indicator of a facial fracture—was apparent the night of November

19.  [R. 152-10 at 12.]  LPN Newton failed to document it or missed it entirely.  These oversights

call into question the thoroughness of her physical examination.  On these facts, Mr. Reece has

introduced substantial evidence that LPN Newton, as a medical professional, should have

recognized Mr. Reece had a condition that posed an excessive risk to his health.

So, the question becomes whether Mr. Reece has introduced substantial evidence to

support a finding that she "*recklessly* failed to act with reasonable care to mitigate" the risk to

Mr. Reece's health.  *See also Cook v. Martin*, 148 F. App'x 327, 337 (6th Cir. 2005) ("[Plaintiff

must show something more than mere negligence in his attempt to . . . establish deliberate

indifference . . . .").  Again, the answer is yes.  Here, the only action LPN Newton took to

mitigate the risk to Mr. Reece was to place him on hourly neuro checks.  She did not provide any

medication, consult with another medical provider, or take any other steps.  [*See* R. 157-1 at 4.]

Further, the record reflects Mr. Reece was *not* checked hourly following LPN Newton's exam.

[*See* R. 187-3 at 32.]

The Court is hesitant to characterize a medical treatment plan as "reckless" where LPN

Newton performed a base level evaluation of Mr. Reece's injuries and used her discretion to

formulate the proper course of treatment.  But, according to the standards set forth by Defendants'

experts, Mr. Reece has a legitimate argument that LPN Newton's evaluation fell drastically short

of what Mr. Reece's injuries called for.  [*See* R. 187-3 at 21–24.]  Moreover, to the extent LPN

Newton did recognize the potential of neurological trauma, she set out a questionable treatment

---

[10] Southern Defendants argue this statement, made by the deputy jailer to a state investigator after the
assault, is inadmissible hearsay.  [R. 193 at 3.]  However, Defendants fail to provide any developed
argument on this point.

plan that was not followed. *Id.* at 32. For these reasons, a reasonable jury could find the care provided by LPN Newton was so flawed as to constitute recklessness. LPN Newton is not entitled to summary judgment on Mr. Reece's "right to adequate medical care" claim.

LPN Newton also claims she is entitled to summary judgment on this claim for a separate reason. Here, she cites to *Napier v. Madison County*, 238 F. 3d 739, 742 (6th Cir. 2001) for the proposition that a "right to adequate medical care" claim requires "verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." [R. 15-2 at 46–47.] She argues Mr. Reece has failed to provide any such evidence. *Id.*

There are two issues with this line of argument. First, *Napier* was a pre-*Kingsley* case in which the Sixth Circuit analyzed a pretrial detainee's claim under a standard formulated for Eighth Amendment claims. 238 F. 3d at 742 (citing *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1188 (11th Cir. 1994)). In that context, the *Napier* court looked to the "detrimental effect of the delay in medical treatment" to "examine the seriousness of a deprivation." *Id.* But, as set forth in *Kingsley*, the Fourteenth Amendment affords pretrial detainees greater protections than those afforded to convicted prisoners by the Eighth Amendment—"pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley*, 576 U.S. at 400 (citation omitted). Post-*Kingsley*, any inquiry into the "seriousness of the deprivation" is inapposite in the pretrial detainee context. *Love*, 376 F. Supp. 3d at 745.

Second, the facts of this case are distinguishable from *Napier*. In *Napier*, a prisoner brought suit alleging a violation of his right to adequate medical care claim where prison officials did not arrange for him to attend scheduled dialysis during his two-day stint in jail. 238 F. 3d at 741. The *Napier* court found there was no detrimental effect because the prisoner regularly missed dialysis treatments even when he was not incarcerated. *Id.* at 741–43

16

("[M]edical records also indicate that Napier missed forty-one scheduled dialysis treatments in 1997."). In contrast, here, Mr. Reece suffered significant injuries during his incarceration and there is some evidence to support his assertion that his symptoms were made worse by the delay in diagnosis. [*See* R. 193-2 at 2 ("I do think that the depression and the headaches may have been made worse [by the delay].").] Moreover, unlike the *Napier* plaintiff, Mr. Reece sought treatment the day after his release, and thirty days after he was examined by LPN Newton, due to continued concern with "the dent in [his] head" and "the blood in [his] throat." [R. 188-6 at 107.] It remains that LPN Newton is not entitled to summary judgment on this claim.

### ii

The care provided by LPN Heather Neal warrants another conclusion. LPN Neal attended to Mr. Reece twice: the morning of November 20, the day after the assault, and on November 27, after Mr. Reece submitted a medical care request form. [R. 152-4 at 2, 9.] LPN Neal argues that the records from these visits show she "[c]learly did not disregard the Plaintiff or his medical condition." [R. 152-1 at 43.] The Court agrees.

In both instances, LPN Neal conducted a physical examination of Mr. Reece and, importantly, contacted Dr. Ronald Waldridge, the medical director, to inform him of Mr. Reece's injuries. [R. 152-4 at 2, 9.] During the first visit, LPN Neal noted the following: "Knot center of forehead. Mult[iple] scratches, bruising [both] eyes, chest, upper back." [R. 152-4 at 9.] She also noted Mr. Reece complained of lower back pain and issues with urinating and bowel movements. *Id.* LPN Neal ordered a urinalysis at this time and contacted Dr. Ronald Waldridge, the medical director, to inform him of Mr. Reece's injuries. Dr. Waldridge ordered ibuprofen twice a day and "push fluids." *Id.* at 4, 10.

17

During the second visit, LPN Neal palpated above Mr. Reece's right eye as part of the examination and found that area to be "soft."  [R. 187-11 at 41.]  This finding and Mr. Reece's other symptoms concerned LPN Neal and, as demonstrated by her texts to Dr. Waldridge, she made her concerns known.  [*See* R. 188-35.]  In those texts, she sent Dr. Waldridge a picture of Mr. Reece, noted the symptoms that seemed to indicate serious head injuries, and specifically inquired whether an X-ray was necessary.  *Id.* at 1–2 ("There's a soft area. . . . My concern is the higher ups seem to be extremely concerned.").  In his text response to LNP Neal's concerns, Dr. Waldridge stated, "I'm happy with sending to ER, there isn't an X-ray I can order in jail that will let us know everything is fine."  *Id.* at 4.  Still, Mr. Reece was not sent to the hospital.  Instead, LPN Neal put Mr. Reece on the list to be seen by APRN Jensen or PA Coleman, in line with Dr. Waldridge's instructions.  *Id.* at 3 ("I'll put him on the list.").

These conscientious actions by LPN Neal show that (1) she recognized there was a risk to Mr. Reece's health based on his injuries and (2) that she did not act recklessly in attempting to mitigate that risk.  Instead, she properly assessed that there were possible head injuries and deferred to higher ups—a course of action Mr. Reece condones when addressing other providers' apparent failures.  [*See* R. 183 at 21 ("[Newton] never notified Dr. Waldridge about Reece's injuries."); *see also* R. 157-1 at 4 (Plaintiff's expert discussing other LPNs' failures "to consult with RN, APRN, [or] PA").]  LPN Neal is entitled to summary judgment on Mr. Reece's "right to adequate medical care" claim.

### iii

LPN Geri McClain had one extended interaction with Mr. Reece when she attended to him on November 24.  [R. 152-4 at 6.]  This visit, five days after admission, was conducted per jail regulations with each inmate as part of the intake process.  [*Id.*; R. 187-3 at 19.]  Notably,

18

LPN McClain was aware Mr. Reece was previously assaulted in the jail.  [R. 187-12 at 49–50.]

Mr. Reece remained on regular neuro checks at this time.  *Id.* at 42–43.

 During the November 24 visit, LPN McClain noted that Mr. Reece was "red on the

[right] side of [his right] eye" but noted little else and remembered little else about the visit when

questioned.  [*Id.* at 6–7; R. 187-12 at 39.]  For example, she did not remember whether she

palpated his head.  [R. 187-12 at 39.]  She did remember Mr. Reece saying he had been hit above

his right eye, that he had a headache, and that he requested that she take a picture of his face so

that "when he got out, he would have something."  *Id.* at 39–40.  The record reflects she took the

pictures but never shared them with anyone.  *Id.* at 40.

Based primarily on this exam, Mr. Reece claims LPN McClain was deliberately indifferent

to his right to adequate medical care.  [R. 183 at 23.]  LPN McClain disagrees, arguing she is

entitled to summary judgment because she "conducted the required physical examination and

documented her observations of Plaintiff on the observation log."  [R. 152-1 at 49.]  For similar

reasons as LPN Newton, LPN McClain is not entitled to summary judgment on this claim.

First, a reasonable jury could conclude LPN McClain should have known that Mr. Reece

had a condition that posed an excessive risk to his health.  But like LPN Newton, LPN McClain

failed to observe the indentation in Mr. Reece's forehead or to palpate his head or face.  [R. 152-

4 at 6; R. 187-12 at 40.]  And LPN McClain was expressly told by Mr. Reece that he had a

headache after being hit on the head but failed to document as much.  [R. 187-12 at 35, 39–40.]

LPN McClain's cursory notes reflect a cursory examination that ignored clear clinical indicators

for neurological trauma.

Second, Mr. Reece has introduced substantial evidence to support a finding that LPN

McClain "*recklessly* failed to act with reasonable care to mitigate" the risk to Mr. Reece's health.

19

Beyond "just check[ing] on" Mr. Reece on December 2, 3, and 4 because he was in isolation, LPN McClain did nothing to mitigate the apparent risk to Mr. Reece's health.  Like LPN Newton, at no point did she consult with another medical provider or take any other steps.  [*See* R. 157-1 at 4.]  In fact, while she took pictures of Mr. Reece at his request, she did not share those pictures with Dr. Waldridge or anyone else.  [R. 187-12 at 40–41.]

True, LPN McClain was in a slightly different position from LPN Newton, as she examined Mr. Reece five days after the assault and after two other medical providers had already attended to Mr. Reece.  And when Mr. Reece presented to her, he was on hourly neuro checks, ibuprofen, and "push fluids."  [R. 152-4 at 4, 10.]  But as to LPN McClain, the fact that Mr. Reece received prior medical care could cut either way.  At the very least, LPN McClain should have been alert to the possibility that Mr. Reece required further medical attention based on his medical records to that point—none of the previous measures resulted in a conclusive diagnosis as it concerned Mr. Reece's neurological symptoms.[11]  To this point, as stated above, the purpose of hourly neuro checks is to "make sure [an inmate's] neurological status doesn't change.  It's very common to do after a head trauma."  [*See* R. 187-3 at 9.]  But even though Mr. Reece continued to complain of headaches during his visit with LPN McClain, she failed to even document as much in the medical record.  [*Id.* at 7; R. 187-12 at 35 ("[H]e said his head hurt.").]

Mr. Reece has introduced sufficient evidence that LPN McClain failed to address an excessive risk she should have been aware of based on Mr. Reece's medical records and the symptoms he exhibited at the time.  And a reasonable jury could find the care she provided was

---

[11] Mr. Reece was not put on the list to see APRN Jensen or PA Coleman until three days later, November 27, when LPN Neal was directed to do so by Dr. Waldridge.  [R. 188-35 at 3.]

so flawed that her failure to recognize and address that risk constituted recklessness.  LPN McClain is not entitled to summary judgment on the "right to adequate medical care" claim.[12]

**iv**

On December 1, RN Heather Lowe attended to Mr. Reece—the third medical provider to do so following the assault.  [R. 152-4 at 2.]  This visit occurred four days after LPN Neal's November 27 visit with Mr. Reece where LPN Neal contacted Dr. Waldridge, expressed her concerns with Mr. Reece's symptoms, suggested a facial X-ray, and put Mr. Reece on the list to be seen by APRN Jensen or PA Coleman.  [*See* R. 188-35.]  As to the December 1 visit, RN Lowe testified that Mr. Reece requested to come to medical because "he wanted to be reassured that he was going to be seen at the next doctor visit."  [R. 187-16 at 16.]  RN Lowe assured Mr. Reece that he was still on the list to be seen by the nurse practitioner and conducted a physical examination—noting that he had bruising around his eye but no complaints of pain.  *Id.* at 17–18.  Mr. Reece received his first X-ray the next day, December 2.  [R. 152-4 at 12.]

Mr. Reece claims RN Lowe was deliberately indifferent to his right to adequate medical care during this December 1 visit.  [R. 183 at 23.]  RN Lowe disagrees, arguing she is entitled to summary judgment because "[h]er single, brief interaction arose when Plaintiff requested not medical care, but information about whether he was to be seen by the medical provider."  [R. 152-1 at 35.]  And she argues summary judgment is clearly proper as she "not only provided him with that information but took the further steps of conducting a physical examination during which the Plaintiff advised her that he was not in pain."  The Court agrees with RN Lowe.

---

[12] Like LPN Newton, LPN McClain makes the alternative argument that a "right to adequate medical care" claim requires "verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed," based on *Napier v. Madison County*, 238 F. 3d at 742.  For the reasons set forth when addressing LPN Newton's identical argument, this line of argument is unavailing.  *See supra* Section II.B.2.b.1.

21

Mr. Reece has introduced no evidence that RN Lowe recklessly failed to recognize or address a risk to his health.  As noted, as of December 1, LPN Neal had already documented the soft spot on Mr. Reece's head, notified Dr. Waldridge of the concerning symptoms and, in line with Dr. Waldridge's instructions, put Mr. Reece on the list to be seen by the nurse practitioner or physician's assistant.  [*See* R. 188-35.]  The Court has already concluded LPN Neal's actions were reasonable and, importantly, Mr. Reece does not contend there was any material change in his condition between November 27 and December 1.  Consequently, RN Lowe's actions were eminently reasonable: she conducted a physical examination to confirm LPN Neal's diagnosis, documented similar symptoms as LPN Neal, and then relied on the reasonable course of treatment already set forth by LPN Neal and Dr. Waldridge which ensured further medical care. Any argument that RN Lowe was deliberately indifferent to Mr. Reece's medical needs is unfounded.[13]  As such, RN Lowe is entitled to summary judgment on Mr. Reece's "right to adequate medical care" claim.

**v**

PA Christy Coleman attended to Mr. Reece on December 8.  [R. 152-4 at 3.]  Her examination of Mr. Reece did not result in any significant changes in his treatment plan—she palpated the "dent" on Mr. Reece's forehead, diagnosed it as a possible hematoma, and placed him on the follow-up list to "re-check" in a week.  *Id.*  Notably, PA Coleman did not order a CT scan to further diagnose Mr. Reece's head injuries, concluding it was not "clinically indicated at the time [she] saw Mr. Reece."  [R. 187-5 at 39.]

---

[13] In her report, Mr. Reece's expert opined that RN Lowe was negligent based on her apparent failure to consult with the APRN or PA "who were onsite and conducting clinic" on December 1.  [R. 153-14 at 4.] The Court has excluded this portion of the expert testimony because Mr. Reece provided "no evidence to support this belief that the other, unidentified medical providers were on site."  [R. 207 at 7–10.]

Mr. Reece takes issue with the process used by PA Coleman to make this assessment, arguing it "fell willfully [sic] short of being adequate" and amounted to deliberate indifference. [R. 183 at 24.]  PA Coleman argues she is entitled to summary judgment on this claim because it amounts to a disagreement with her "medical judgment" which is "insufficient to state a claim for deliberate indifference.  [R. 152-1 at 56.]  PA Coleman is correct—Mr. Reece has introduced no evidence that she recklessly failed to recognize or address a risk to his health.

PA Coleman was the first provider to see Mr. Reece after his negative X-ray on December 2 and Mr. Reece's December 5 submission of a medical request form and the first "advanced practice clinician" to see him after the assault.  [*See* R. 152-4; R. 170 at 19.] Particularly relevant for PA Coleman's December 8 assessment was the doctor's note on the negative X-ray results.  The results registered no fracture and read specifically as follows: "There is no radiographic evidence of acute disease.  If there is a high clinical index of suspicion, then CT is recommended because it is a more accurate exam."  [R. 152-4 at 12.]  And following the X-ray, on December 5, Mr. Reece submitted another medical request form, stating: "My head and back hurts from getting hit and kicked.  Bone above eye really sore.  Theirs [sic] something wrong.  Plus its smashed in that should tell you something.  Did he take x-ray of right eye or something else."  [R. 152-4 at 16.]  Clearly, to Mr. Reece's point, PA Coleman's examination provided an important opportunity for Mr. Reece's injuries to be properly diagnosed.

PA Coleman examined Mr. Reece, failed to diagnose the facial fractures, and chose not to order the CT scan.  Two main findings led to these conclusions: (1) when PA Coleman palpated Mr. Reece's forehead in the aggravated area, "he denied being tender"; and (2) during the examination, Mr. Reece exhibited normal neurological behavior and "did not seem in any acute distress."  [R. 187-5 at 39.]  Notably, PA Coleman testified she was aware of the note in

23

the X-ray finding but chose not to order the CT scan because she found there was not a "high clinical index of suspicion." *Id.* at 38–39.

Mr. Reece argues the process used by PA Coleman was faulty because (1) she "performed no neurological assessment"[14] and (2) she did not fully review his medical file prior to the examination. PA Coleman's process likely could have been more thorough, but more is needed to prove deliberate indifference. Again, Mr. Reece must point to evidence which tends to prove that PA Coleman knew, or should have known, that Mr. Reece suffered from a serious medical condition that posed an excessive risk to health or safety and "*recklessly* failed to act with reasonable care to mitigate" that risk. *Bruno*, 727 F. App'x at 720; *see also Cook v. Martin*, 148 F. App'x 327, 337 (6th Cir. 2005) ("[Plaintiff must show something more than mere negligence in his attempt to . . . establish deliberate indifference . . . ."). He has failed to do so.

For one, as pointed out by PA Coleman, Mr. Reece fails to "relate an alleged failure to review the chart to any failure to properly assess Plaintiff." [R. 193 at 9.] In other words, Mr. Reece does not point to any evidence in the medical records that likely would have changed PA Coleman's examination or ultimate diagnosis. Second, PA Coleman did take note of Mr. Reece's neurological symptoms, explaining in her deposition as follows: "He was obviously alert. Neurologically, walking, talking, did not seem in any acute distress." [R. 187-5 at 39.]

Mr. Reece has provided no explanation as to how the process employed by PA Coleman fell short in any meaningful way. PA Coleman recognized there was a risk that Mr. Reece had undiagnosed neurological injuries and took steps to properly diagnose those injuries. Ultimately, instead of recognizing that the dent in Mr. Reece's head was the sign of a facial fracture, she

---

[14] Mr. Reece also contends "there is no indication she ever palpated the area" above his eye [R. 183 at 25], but the medical records directly refute this contention: "He voiced no discomfort when palpating area." [R. 152-4 at 3.] The Court takes a dim view of blatant mischaracterizations of the record, especially where similar "errors" are included with some consistency. [See *supra* Section II.A.1.b.]

concluded it was a possible hematoma and decided to follow up later to confirm the diagnosis. Plain and simple, she missed the diagnosis. But any contention that she was reckless in conducting her evaluation of Mr. Reece is unfounded. PA Coleman is entitled to summary judgment on Mr. Reece's "right to adequate medical care" claim.

### vi

APRN Jensen attended to Mr. Reece on December 15—the last medical care provided to Mr. Reece before his discharge on December 18. [R. 152-4 at 3.] APRN Jensen saw Mr. Reece a week after PA Coleman to follow up on PA Coleman's findings. *See id.* APRN Jensen observed similar symptoms as PA Coleman, noting that Mr. Reece had "tenderness of indentation above [right] eye, . . . [right] orbit pain [post] altercation" and that he was alert and well-oriented. *Id.* Based on these findings, APRN Jensen upped his pain medication and ordered a second X-ray of the right side of Mr. Reece's face. *Id.* Taken that same day, the second X-ray was more extensive—taking four views of Mr. Reece's face—but the results were the same as the first: "No evidence of an acute facial fracture." *Id.* at 11. Accordingly, APRN Jensen entered no new orders. [R. 187-6 at 36.]

Mr. Reece argues that APRN Jensen should have ordered a CT scan based on her findings and that her failure to do so amounts to deliberate indifference. [R. 183 at 26.] Like PA Coleman, APRN Jensen argues she is entitled to summary judgment on the right to adequate medical care claim because it amounts to a disagreement with her "medical judgment" which is "insufficient to state a claim for deliberate indifference." [R. 152-1 at 54.] And, like PA Coleman, she is correct—Mr. Reece has introduced no evidence that APRN Jensen recklessly failed to recognize or address a risk to his health.

In large part, APRN Jensen is entitled to summary judgment on this claim for the same reasons as PA Coleman: she recognized the risk to Mr. Reece, took measured steps to diagnose

the extent of Mr. Reece's injuries based on his symptoms and, while she missed the diagnosis, her actions were not reckless in any way.  In fact, APRN Jensen took the additional step of ordering an additional, more extensive X-ray.  [R. 152-4 at 3.]  Granted, maybe this was the wrong thing to do from a medical standpoint—Mr. Reece has a legitimate argument that based on the findings to that point, a CT scan should have been ordered.  But, again, any argument that her actions were reckless is unfounded.  APRN Jensen is entitled to summary judgment on Mr. Reece's "right to adequate medical care" claim.

### vii

Finally, the Court turns to whether Dr. Waldridge, the medical director for the jail, is entitled to summary judgment on Mr. Reece's "right to adequate medical care" claim.  He claims he is because he "did not act with knowledge or deliberate ignorance of a substantial risk to Plaintiff's health."  [R. 152-1 at 50.]  The Court agrees.

Mr. Reece argues Dr. Waldridge was deliberately indifferent because he effectively "abandoned his duties as the primary physician" and, as such, created a "general threat to inmate health."  [R. 183 at 27.]  While imaginative, this line of argument is unpersuasive.  [*See* R. 183 at 27 ("[S]potting Waldridge at a jail was like spotting Bigfoot, while some people claim to have seen the yeti, there is no actual proof confirming any encounter.").]  Here, Dr. Waldridge's role and the extent to which he delegated that role is important.

Dr. Waldridge was hired as an independent contractor by Southern to be medical director at the jail and provide professional medical services to the inmates.  [R. 187-2; R. 187-4.]  As part of this agreement, Dr. Waldridge was to "visit the site once per week for up to four (4) hours per visit."  [R. 187-4.]  Notably, he was able to delegate this responsibility, and did.  [R. 187-15 at 27.]  Dr. Waldridge contracted with APRN Jensen and PA Coleman to provide clinical

26

services.  [R. 152-1 at 1–2.]  This established, Dr. Waldridge did not ever personally attend to Mr. Reece but was contacted twice by LPN Neal with regard to his treatment.

First, on November 20, LPN Neal contacted Dr. Waldridge to inform him of Mr. Reece's injuries.  Based on LPN Neal's description of Mr. Reece—bruising and scratches on the face and issues with urination and bowel movements—Dr. Waldridge ordered ibuprofen twice a day and "push fluids."  *Id.* at 4, 10.  Next, LPN Neal contacted Dr. Waldridge on November 27 with additional concerns after observing that Mr. Reece had a soft spot on his head and issues with blurry vision.  LPN Neal also asked if an X-ray was advisable at this time.  [R. 188-35.]  Dr. Waldridge responded and increased the ibuprofen dosage and directed Mr. Reece be put on the list to see PA Coleman or APRN Jensen, in order that they could further diagnose his injuries. *Id.*  This is the extent of Dr. Waldridge's involvement with Mr. Reece's medical complaints.[15]

In the first instance, Dr. Waldridge was unaware of the more worrisome symptoms that Mr. Reece was exhibiting—namely the indentation on his forehead and blurry vision.  In the second instance, Dr. Waldridge was made aware of the more worrisome symptoms and ordered that Mr. Reece be put on the list to be seen by one of the advanced practice clinicians—APRN Jensen or PA Coleman.  True, LPN Neal specifically asked whether an X-ray was needed and Mr. Reece takes issue with Dr. Waldridge's failure to order an X-ray on the spot.  Based on Mr. Reece's symptoms, maybe Dr. Waldridge should have done so.  Instead, he declined to make that decision based on the pictures alone and ensured that APRN Jensen or PA Coleman would address the injuries on their next visit.  Dr. Waldridge might have done more but Mr. Reece has failed to show he was reckless with regard to Mr. Reece's health.

---

[15] Mr. Reece contends Dr. Waldridge learned Mr. Reece was placed on hourly neurological assessments for a head injury on November 24 but provides no citation to support this contention.  [R. 183 at 27.]

That said, Mr. Reece's issue with Dr. Waldridge's care is based largely on his absence from the jail. [R. 183 at 27.] But this line of argument is unavailing. The arrangement with APRN Jensen and PA Coleman itself was not "reckless"—in fact, Southern approved the arrangement. And Mr. Reece has introduced no evidence to support an inference that APRN Jensen or PA Coleman were, as a general matter, unqualified to perform these services. Dr. Waldridge is also entitled to summary judgment on the "right to adequate medical care" claim.

**c**

**i**

The Court will next consider whether the various Shelby County Defendants are entitled to summary judgment on the medical care claims, starting with Defendant Christy Bailey. Ms. Bailey argues she is entitled to summary judgment because "Reece can present no evidence on which a jury could reasonably conclude that Deputy Bailey was deliberately indifferent to his medical needs." [R. 156-1 at 15.] Ms. Bailey argues more specifically that "the record is void of any evidence she had any interaction with Reece beyond intake and booking into [the jail] on November 18, 2015, well before the assault occurred and before any medical care was rendered." *Id.* at 17. In his response, Mr. Reece fails to address Ms. Bailey's argument on this claim. [*See* R. 182-1 at 19.] As such, it appears he concedes summary judgment is proper here.

Review of the record supports Ms. Bailey's claim that she had "no personal involvement" with Mr. Reece's medical treatment [R. 156-1 at 17], as required for § 1983 liability. *Reed-Bey v. Pramstaller*, 607 F. App'x 445, 451 (6th Cir. 2015). More specifically, there are no facts to support an inference that Ms. Bailey knew, or should have known, that Mr. Reece suffered from a serious medical condition that posed an excessive risk to health or safety. *Bruno*, 727 F. App'x at 720. Accordingly, the Court grants Ms. Bailey summary judgment on this portion of Count I.

28

**ii**

Defendant Bobby Waits also moves for summary judgment on the "failure to provide adequate medical care" claim. [R. 156-1 at 24–28.] Defendant Waits was the Shelby County Jailer at the time of Mr. Reece's stay. [R. 188-4 at 8.] This established, Mr. Waits argues "there is no evidence [he] knew or recklessly disregarded knowledge that jail personnel acted with some form of deliberate indifference to Plaintiff's medical needs . . . " and, as such, he is entitled to qualified immunity. *Id.* at 28. In large part, Mr. Waits argues that Mr. Reece fails to establish the subjective prong of deliberate indifference—a sufficiently culpable state of mind.[16] *Id.* at 16. Mr. Reece disagrees, arguing "Waits had personal knowledge that Reece was not being medically treated because he was not capable [sic] of being diagnosed at the jail." [R. 182-1 at 36.]

Federal qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation and quotations omitted). When evaluating such claims, courts generally apply a two-step analysis. First, the court considers whether "the facts . . . alleged or shown [by the plaintiff] make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). Second, the court asks whether "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* (citation omitted).

Here, the analysis ends at the first step. As noted at length, to succeed on a "failure to provide adequate medical care" claim, Mr. Reece must show that (1) he or she suffered a serious medical condition and (2) that defendants "recklessly failed to act with reasonable care to

---

[16] Many of Mr. Waits' arguments are based on standards which no longer control following *Kingsley* [*see* R. 156-1 at 16], and understandably so—the Sixth Circuit has yet to visit this specific issue. *See Griffith*, 975 F.3d at 570.

mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Bruno*, 727 F. App'x at 720. Again, it is not seriously disputed that Mr. Reece has shown that he suffered from a serious medical condition during his incarceration.[17] This established, Mr. Reece fails to point to any facts showing that Mr. Waits, as a non-medical officer, "knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*

To establish deliberate indifference, Mr. Reece largely depends on text messages between LPN Neal and Dr. Waldridge about Mr. Reece's condition, which were subsequently forwarded to Mr. Waits. [*See* R. 182-1 at 17.] At first blush, these texts seem to raise a legitimate factual issue on the question of whether Mr. Waits should have realized there was an excessive risk to Mr. Reece's health. In the messages, the medical providers acknowledge that their diagnostic capabilities within the jail are limited, such that the true extent of Mr. Reece's injuries could not be determined. *Id.* For example, Dr. Waldridge, the medical director, texted "I'm happy with sending to ER, there isn't an X-ray I can order in jail that will let us know everything is fine." *Id.* at 4. And APRN Jensen, a nurse who worked in the facility, forwarded these messages to Mr. Waits, noting that "Doc said there wasn't anything he could order here to diagnose him." *Id.* at 6. But the messages must be viewed in context.

To be sure, the messages establish that Mr. Waits was aware of the issue with diagnosing Mr. Reece's injuries. But this does not mean he, as a non-medical professional, "knew, or should have known, that the [injuries] posed an excessive risk to health or safety." *Bruno*, 727 F. App'x at 720. The texts from medical personnel which alerted Mr. Waits to the potential issue were equivocal on whether outside medical attention was needed. [*See* R. 188-35 at 6 ("The x-

---

[17] To restate, the record reflects that Mr. Reece had serious facial fractures which required reconstructive surgery following the assault. [R. 153-14 at 4; R. 188-36 at 6.]

ray for Reece was normal.  Doc said there wasn't anything he could order here to diagnose him.").]  The medical team never made any recommendation or request to send Mr. Reece to the emergency room but, instead, simply acknowledged the possibility.  Relatedly, Mr. Reece points to no facts indicating that Dr. Waldridge or any other medical personnel, explained the possible significance of the injuries or the failure to properly diagnose to Mr. Waits.[18]  In fact, certain medical personnel did not seem concerned with Mr. Reece's condition based on examinations. PA Coleman, who examined Mr. Reece two weeks after the assault, testified that: "On physical exam, he was not tender. He denied being tender. He was obviously alert. Neurologically, walking, talking, did not seem in any acute distress."  [R. 187-5 at 39; R. 152-4 at 3.]

Mr. Reece largely takes issue with Mr. Waits' decision not to "override" the medical providers and send Mr. Reece to receive outside medical care, even without a recommendation to do so.  [*See* R. 182-1 at 17.]  But this asks too much.  It is unclear why Mr. Reece believes Mr. Waits should have recognized the need for outside medical attention where the medical professionals clearly did not.  On the record, there is no support for the contention that the need for additional care was readily apparent to a layperson—especially where that layperson did not see Mr. Reece in person.  *See Harris v. City of Circleville*, 583 F.3d 356, 368 (6th Cir. 2009) (citing *Blackmore v. Kalamazoo County,* 390 F.3d 890, 897–900 (6th Cir. 2004)).

In these situations, the onus is on medical personnel to make decisions as to what medical care is required, not the non-medical officers.[19]  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d

---

[18] While Mr. Waits did follow up with Dr. Waldridge, the extent of this conversation is unknown. Without any evidence as to the content of that conversation, the Court declines to draw inferences either way. Oddly enough, it does not appear Mr. Waits was asked in his deposition about this conversation or the text message conversation he was forwarded.  [*See* R. 188-4.]

[19] In fact, "overriding" the medical providers' decision not to send an inmate out was something Mr. Waits could do only in times of emergency and something he had never done.  [R. 188-4 at 31.]

31

Cir. 2004) ("Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.").  So, where Mr. Waits deferred to the medical professionals' decisions, after Mr. Reece received a substantial amount of medical attention [*see* R. 152-1 at 3–8.], it is a stretch to conclude that he was somehow "reckless" in regard to Mr. Reece's injuries.  *McGaw v. Sevier Cty., Tennessee*, 715 F. App'x 495, 498 (6th Cir. 2017) (citation omitted).  Any contention that he "knew, or should have known, that the condition posed an excessive risk" to Mr. Reece's health based solely on the text messages is a step too far.  The Court grants Mr. Waits summary judgment on Mr. Reece's right to adequate medical care claim.

### 3

The only § 1983 claims that remain against Southern Defendants are the claims against Southern and Dr. Waldridge advanced under a theory of "Supervisory Liability" and the claim against Southern advanced under the theory of "Municipal/Organizational Liability."  [R. 1 at ¶¶ 43–46; R. 152-1 at 2.]

### a

Here, Dr. Waldridge argues "Plaintiff has no evidence upon which to rely to support a claim or deliberate indifference against Dr. Waldridge based upon his alleged failure to supervise."  [R. 152-1 at 58.]  In response, Mr. Reece argues broadly that "disputed issues of fact prevent summary judgment for Dr. Waldridge on [the] deliberate indifference claim."  [R. 183 at 26.]  But in his response brief Mr. Reece does not clearly delineate between the different theories he relies on to support this argument.  *See id.* at 26–28.  So, it is unclear how he distinguishes between this claim and his "right to adequate medical care" claim against Dr. Waldridge.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (indicating issues "adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation" may be deemed waived). Mr. Reece's recent supplemental brief is no clearer on this issue. [*See* R. 225 at 2–3.] The Court has already found that Dr. Waldridge is entitled to summary judgment on the right to adequate medical care claim. Because Mr. Reece has failed to provide any explanation as to how the claims differ, the Court finds that Dr. Waldridge is also entitled to summary judgment on this portion of Count I.

**b**

Southern itself is also entitled to summary judgment on the supervisory liability claim. Mr. Reece has clarified that the claim against Southern for failure to supervise is an official capacity claim, given that it performs a traditional state function in providing medical care to pretrial detainees. [R. 225 at 2.] To succeed on such a claim, Mr. Reece must prove the following: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). And, as Mr. Reece acknowledges, he must show as a prerequisite that there is evidence that a constitutional violation occurred. *Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013).

In their motion for summary judgment seeking to dismiss all Mr. Reece's claims against them, Southern Defendants initially failed to directly address the supervisory liability claim against Southern itself. Like with the conspiracy claim, the Court provided Southern Defendants an additional opportunity to address this claim by filing a supplemental memorandum. [*See* R. 222.] Southern Defendants complied and argue Southern is entitled to summary judgment on this claim for two reasons: (1) "Plaintiff has failed to establish any misconduct by Dr.

Waldridge," and (2) "Plaintiff can provide no evidence that [Southern] approved of [any] misconduct."  [R. 224 at 2.]

In response to Southern Defendants' supplemental memorandum, Mr. Reece focuses solely on Southern's alleged inadequate supervision of Dr. Waldridge, not any of the nurses under its employ.  [R. 225 at 2–6.]  Accordingly, as it concerns the constitutional violation at issue, Mr. Reece focuses solely on Dr. Waldridge's alleged violation of Mr. Reece's right to adequate medical care.  But the Court has already found this claim is unsupported by the evidence in the record—i.e., Mr. Reece has failed to establish any misconduct by Dr. Waldridge that rose to the level of a constitutional violation.  As such, Mr. Reece's supervisory liability claim against Southern fails to even get off the ground.  *Watson*, 518 F. App'x at 393.  The Court grants summary judgment to Southern on this portion of Count I.

### 4

The Court turns next to Mr. Reece's failure to protect § 1983 claim, as set forth against Defendant Bailey.  [R. 1 at ¶¶ 34–35.]  Under the Fourteenth Amendment, pretrial detainees have a due process right to be free from violence from other inmates.  *Lamb v. Howe*, 677 F. App'x 204, 208 (6th Cir. 2017).  To succeed on a failure to protect claim, a pretrial detainee must show (1) that he suffered a "sufficiently serious" constitutional deprivation, and (2) that jail officials acted with deliberate indifference towards the conditions that created a substantial risk of harm.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Under the first element, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* (cleaned up).  Under the second element, the inmate must show a defendant "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-

34

official knew, or should have known, that the condition posed an excessive risk to health or safety." *Bruno*, 727 F. App'x at 720; *see also Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

### a

Ms. Bailey moves for summary judgment on this claim, arguing she is entitled to qualified immunity. As noted above, courts generally apply a two-step analysis to determine whether a defendant is entitled to qualified immunity.  First, the court must consider whether "[t]aken in a light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Katz*, 533 U.S. at 201.  Second, the court asks whether the right at issue was "clearly established." *Id.*

Here, Ms. Bailey contends the qualified immunity inquiry ends at the first step.  She argues Mr. Reece has not produced any facts to prove the second element of his "failure to protect" claim—that she was deliberately indifferent.[20]  [R. 156-1 at 19.]  Mr. Reece disagrees, arguing that (1) Bailey intentionally assigned Mr. Reece to cell 317, knowing of Mr. Carey's scheme to orchestrate an assault, and, alternatively, (2) that Bailey was reckless in assigning Mr. Reece to cell 317 because it was an overcrowded cell with dangerous inmates.  [R. 182-1 at 29–34.]

The Court agrees with Ms. Bailey—Mr. Reece has failed to provide any facts to support his contention that Ms. Bailey was deliberately indifferent.  First, in resolving Mr. Reece's conspiracy claim against Ms. Bailey, the Court has already rejected the arguments that she was aware of or supported Mr. Carey's scheme.  There is simply no evidence to support the inference that Ms. Bailey acted intentionally to bring harm to Mr. Reece.  *See supra* Section II.A.1.b. Similarly, there are no facts to support the inference that Ms. Bailey "recklessly failed to act with

---

[20] Ms. Bailey does not dispute that Mr. Bailey can establish the first element of the claim—that he was "incarcerated under conditions posing a substantial risk of serious harm." *Brown*, 207 F.3d at 867.

reasonable care to mitigate the risk" to Mr. Reece where she "knew, or should have known, that the condition posed an excessive risk to health or safety." *Bruno*, 727 F. App'x at 720

In conducting this analysis, it is important to determine the condition that posed the excessive risk to Mr. Reece. Mr. Reece appears to contend that the dangerous condition was Mr. Reece's placement in cell 317 based on certain inmates' presence and the "overcrowding" in that cell. [R. 182-1 at 34.] To support this contention, Mr. Reece points to the presence of two allegedly dangerous inmates who participated in the assault and were also housed in cell 317: Corey Hopper and Rodney Bowling. *Id.* ("When [Ms. Bailey] checked the cell for overcrowding, she should have seen Hopper and the twelve separate conflicts he had with other inmates."). But to adopt the view that the dangerous condition was simply the state of the cell itself, the Court would have to ignore why the assault occurred. Plainly, Mr. Reece's assault did not occur simply because he was housed in an allegedly dangerous cell. *Cf. Young v. Campbell Cty., KY*, No. 2:17-CV-97 (WOB-EBA), 2020 WL 411710, at *2 (E.D. Ky. Jan. 24, 2020) (analyzing a failure to protect claim where a known violent inmate assaulted the plaintiff without any solicitation). It occurred because Mr. Carey, as Mr. Reece acknowledges, "went directly to Hopper—who was also housed in cell 317—to solicit him for the assault." [R. 182-1 at 13.]

So, the question becomes: has Mr. Reece introduced evidence that Ms. Bailey "knew, or should have known" about that dangerous condition? The answer is no. On the record, Ms. Bailey had no awareness that Mr. Carey, as a deputy jailer, would orchestrate an assault of Mr. Reece or any other inmate and there are no facts that indicate she *should* have been aware.

And even if the Court were to focus on the state of the cell itself—as opposed to the specific dangerous condition created by Mr. Carey—Mr. Reece overstates the dangerous nature of cell 317. Again, here, Mr. Reece points to the presence of Mr. Hopper and Mr. Bowling. [R.

182-1 at 34.]  But on review, the record reflects that while Mr. Hopper was anything but a model inmate [*see* R. 155-13], he was not a *known* violent offender who frequently engaged in violent behavior towards fellow inmates, as Mr. Reece's briefing suggests.  [*See e.g.*, R. 194 at 7 n. 7.] The same is true of Mr. Bowling.  *See id.* at 11.  So, there is no evidence indicating that Ms. Bailey was aware or should have been aware of any instance in which Mr. Hopper or Mr. Bowling had previously engaged in violent behavior that was anywhere close to the assault perpetrated on Mr. Reece.

Finally, Mr. Reece's closely related argument that Ms. Bailey was reckless in the way she classified inmates is unconvincing.  [R. 182-1 at 33.]  Other courts have found that misclassification of inmates can amount to deliberate indifference where jail officials "failed to use objective criteria to classify inmates."  *Gardner v. Kenton Cty.*, No. CIV-A. 09-70 WOB-JGW, 2012 WL 6623097, at *5 (E.D. Ky. Dec. 19, 2012), *aff'd* (Oct. 25, 2013) (citations omitted).  Here, that is not the case.  The record is limited on this issue but reflects that, at booking, Ms. Bailey classified Mr. Reece and other inmates based on various objective criteria. [R. 188-3 at 16; R. 188-4 at 12–13.]  Importantly, Mr. Reece has not pointed to any evidence showing that she disregarded these criteria.  Mr. Reece may object to the judgment calls Ms. Bailey made when classifying based on these criteria but, in light of the "reckless" standard, this line of argument is unavailing.

Mr. Reece has failed to point to facts showing Ms. Bailey was deliberately indifferent in failing to protect him from the assault, as such, she is entitled to summary judgment on the failure to protect claim.

**5**

Mr. Reece also brings a supervisory liability § 1983 claim against Mr. Waits in his individual capacity.  [R. 1 at ¶¶ 39–42.]  As noted, Mr. Waits was the Shelby County Jailer at the

time of Mr. Reece's stay.  [R. 188-4 at 8.]  This claim seeks to hold Mr. Waits liable based on his alleged failure to train and supervise his deputy jailers and his failure to supervise the medical providers hired by Southern.  [R. 1 at ¶¶ 39–42.]

Before addressing this claim, a clarification is necessary.  In his Complaint, Mr. Reece brings the failure to supervise claim against Mr. Waits in both his individual and official capacity, in addition to asserting claims against Shelby County based on similar theories.  [*Id.*; *id.* at ¶¶ 43–44.]  But the plain language of Mr. Reece's Complaint fails to state a claim against Mr. Waits in his individual capacity for his failure to supervise *Southern personnel*.  Instead, the relevant portion of the Complaint addresses Mr. Waits' "final policymaker" status, as relevant to the claims against Mr. Waits in his official capacity.  *Id.* at ¶ 41.  This established, the claims against Mr. Waits in his official capacity will be analyzed below, in conjunction with the municipal liability claims brought against Shelby County.  In this section, the Court will analyze the supervisory liability claim against Mr. Waits in his individual capacity based on his alleged failure to train and supervise the deputy jailers in the jail.

**a**

Under § 1983, a government official cannot be held personally liable unless they personally "caused the deprivation of a federal right."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  More specifically, as relevant to the present claim, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'"  *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) (quoting *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999)) (cleaned up).  "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Id.* (cleaned up).  To state such a claim, as a

prerequisite, the plaintiff must first show there is evidence that a constitutional violation occurred. *Watson*, 518 F. App'x at 393.

In this case, given Defendant Carey's conduct, analyzed further below, the Court will assume for present purposes that a constitutional violation has occurred. *See infra* Section II.D. This aside, Mr. Waits maintains he is entitled to qualified immunity "there is no evidence that [he] had any personal involvement in [the alleged constitutional] violations or that he implicitly authorized or knowingly acquiesced in such alleged violations." [R. 156-1 at 25; *see McQueen*, 433 F.3d at 470.] Mr. Reece disagrees, arguing Mr. Waits "knowingly abdicated his responsibilities to oversee subordinates and their unconstitutional acts" and, in doing so, encouraged and condoned these acts. [R. 182-1 at 40.] Here, Mr. Reece focuses on Mr. Waits failure to conduct internal investigations of assaults generally and his failure to investigate this specific assault. *Id.*

Even accepting the facts that Mr. Reece relies on as true, his arguments on this claim fall short for two reasons. First, Mr. Waits' decision to turn investigations of assaults within the jail over to law enforcement plainly does not indicate that he encouraged or condoned assaults within the prison. In fact, Mr. Waits explained that the decision to allow outside law enforcement to investigate the assaults was made to ensure there was no perception that assaults were not taken seriously. [R. 188-4 at 26–27.] So, this established, the record reflects that inmates knew assaults would be investigated and potentially result in additional charges against them. *Id.* ("So I just turned it over . . . to law enforcement and let them determine if there was enough to file charges or not.").

Second, Mr. Reece's explanation concerning what Mr. Waits would have discovered had he investigated this assault is largely immaterial to the present inquiry. The question is whether

Mr. Waits implicitly authorized or encouraged the assault; it is not whether Mr. Waits could have discovered the wrongdoing more quickly after it occurred. *McQueen*, 433 F.3d at 470. Per his procedure, Mr. Waits brought in outside law enforcement to investigate the assault and, when informed of Mr. Carey's wrongdoing, terminated him immediately. This line of action certainly does not amount to implicit authorization of the assault.

In sum, Mr. Reece has failed to prove that Mr. Waits was personally involved with the assault on Mr. Reece, as orchestrated by Mr. Carey. The Court grants Mr. Waits summary judgment on the supervisory liability § 1983 claim.

**6**

The Court now turns to Mr. Reece's final § 1983 claim against Shelby County Defendants, brought against Mr. Waits in his official capacity and Shelby County itself. [R. 1 at ¶¶ 41, 43.] In his complaint, Mr. Reece alleges that various Shelby County customs or policies either caused the assault or contributed to his inadequate medical care: (1) failure to oversee the Southern medical providers; (2) failure to adequately train and supervise jail employees; and (3) failure to properly staff the jail. *Id.* Shelby County Defendants move for summary judgment on this "custom or policy" theory of liability, arguing that Mr. Reece has failed to provide evidence that these customs or policies existed and, even if he could, has failed to provide evidence establishing a causal link between the customs or policies and the alleged unconstitutional conduct. [R. 156-1 at 26, 30.]

To establish county liability based on custom, a plaintiff must first demonstrate the deprivation of a constitutional right and, if able to meet that threshold, then demonstrate that the county was responsible for the violation. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Generally, a plaintiff may prove an unlawful custom by

pointing to a policy of inadequate training or supervision. *See City of Canton v. Harris,* 489 U.S. 378, 387 (1989). To succeed on this type of claim, a plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis*, 455 F.3d at 700 (citation omitted). Again, for present purposes, based on Mr. Carey's conduct, the Court will assume Mr. Reece could demonstrate deprivation of a constitutional right. That established, the present analysis will focus on whether an unlawful custom or policy was responsible for the assumed violation.

### a

First, the Court considers the alleged custom of not overseeing the Southern medical providers. Shelby County Defendants argue there is no evidence that "Shelby County . . . [was] a moving force behind a custom or practice or permitting allegedly unconstitutional medical care." [R. 156-1 at 31.] And, as Mr. Reece fails to address this alleged custom in his response, it appears he does not dispute this contention. *See McPherson*, 125 F.3d at 995-96 (indicating issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" may be deemed waived). Consequently, the Court grants summary judgment to Shelby County on this portion of Count I.

### b

Next, Mr. Reece takes issue with Shelby County's alleged policies of failing to adequately train and supervise jail employees and failing to properly staff the jail. [R. 1 at ¶ 43.] In his response to Shelby County Defendants' motion for summary judgment, Mr. Reece clarifies on the customs at issue, alleging "Shelby County is liable . . because it either: (1) failed to supervise its deputy jailers to ensure they were classifying and housing inmates according to the detention center's policies or (2) had a widespread, though unwritten custom or practice of

41

not classifying inmates as medium, but instead, classifying those inmates as minimum." [R. 182-1 at 43.] Shelby County Defendants maintain they are entitled to summary judgment on this claim. [R. 194 at 21, 24.] The Court agrees. Because Mr. Reece has not provided any evidence to establish the requisite elements of a failure to train claim this claim must fail.

Mr. Reece focuses on inadequacies of training and supervision concerning the classification of inmates as minimum, medium, or maximum-security risks. [R. 182-1 at 43.] As stated by Mr. Waits, the purpose of inmate classifications was to protect inmates and jail staff. [R. 188-4 at 13.] Mr. Reece argues that two things show training and supervision was inadequate regarding inmate classification: (1) Ms. Bailey's deposition testimony that there were only two classifications, maximum and minimum, and (2) Mr. Waits' failure to ensure that housing assignments were reviewed daily. For separate reasons, these fall short of creating a genuine issue of material fact on this claim.

### i

True, Ms. Bailey testified in her deposition that only two options existed for classification, maximum and minimum, where in reality there was a third option, medium. [R. 188-3 at 19.] But this misunderstanding, standing alone, fails to show that training was inadequate regarding classification procedures—the first prong of an inadequate training or supervision claim. First, Mr. Waits and Ms. Bailey testified that new deputy jailers who made these classification decisions received extensive training, including classroom training and shadowing of other deputies. [R. 188-4 at 14–16; R. 188-3 at 11–13.] And second, during her time at the jail, Ms. Bailey classified an inmate as medium as recently as two months prior to Mr. Reece's admission. [*See* R. 194-1.] As Ms. Bailey stated numerous times throughout her September 2019 deposition, it had been a "long time" since the incident occurred when she was

42

deposed—nearly four years. [*See* R. 188-3 at 1, 11, 12.] Her conduct in September 2015, two months prior to the assault, indicates that she was well aware of the medium classification and is much more probative on the issue of whether she was adequately trained at the time of the November 2015 assault.

ii

Whether Mr. Waits' failure to ensure that housing assignments were reviewed daily constituted an unlawful policy of inadequate supervision requires closer review. Here, Mr. Reece argues that, under Kentucky law, Mr. Waits had a duty to ensure that housing assignment were reviewed daily to ensure classification categories and housing assignments were proper. [R. 182-1 at 44.] And the record is unclear on whether this daily review occurred. [*See* R. 188-4 at 14 (Mr. Waits testifying about the procedure for reevaluating inmates' security classifications).] This apparent failure is cause for concern. For one, Mr. Waits acknowledged that proper classification of inmates was important to ensure inmate and staff safety. *Id.* at 13. And second, the failure is even more concerning given Mr. Reece's argument that misclassification of inmates led to the present assault. So, for present purposes, the Court will assume that Mr. Reece can meet the first two element of the inadequate supervision claim—that the training or supervision was inadequate for the tasks performed and that the inadequacy was the result of the municipality's deliberate indifference—and proceed to the third.

The third element requires a plaintiff to introduce evidence that the inadequacy was closely related to or actually caused the harm—here, the assault. The law is clear on this element. There must be a causal link between the policy or custom at issue and the injury for a municipality to be held liable. *Monell v. Dep't of Soc. Servs.,* 436 U.S. at 691–92 (1978). In other words, the policy or custom "must be 'the moving force of the constitutional violation' in

43

order to establish the liability of a government body under § 1983." *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir. 1994) (quoting *Polk County v. Dodson,* 454 U.S. 312, 326 (1981)). "Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. 2008) (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1388 (4th Cir. 1987)) (cleaned up).  On this causation element, Mr. Reece's inadequate supervision claim falls short.

As before, it is important to clarify on the nature of the constitutional deprivation in this case. *See supra* Section II.B.4.a.  The unconstitutional conduct that caused Mr. Reece's assault was Mr. Carey's solicitation of other inmates to conduct the assault.  [R. 182-1 at 13.]  Any conclusion that the assault would have occurred without Mr. Carey's involvement is unfounded and speculative.  So, the specific question is whether there is an "affirmative link" between the apparent failure to review inmates' classifications and the assault as solicited by Mr. Carey. Plainly, the answer is no.

Distilled down, Mr. Reece's causation argument tracks as follows: (1) two inmates in cell 317, Corey Hopper and Rodney Bowling, should have been classified as at least medium security risks; (2) if Mr. Waits or a subordinate had reviewed the classifications they would have reached this conclusion; and (3) the failure to review the classifications led to the assault.  [R. 182-1 at 44.]  This line of argument requires inferential leaps the Court declines to make.

First, assuming Mr. Hopper and Mr. Bowling were misclassified, the record does not reflect that they were clearly "non-minimum" security.  Instead, as noted above, the record reflects that while Mr. Hopper was anything but a model inmate, he was not a *known* violent

offender who frequently engaged in violent behavior towards fellow inmates, as Mr. Reece's briefing suggests. [*See e.g.*, R. 194 at 7 n. 7.] The same is true of Mr. Bowling. *See id.* at 11. So, even if the classifications were reviewed on a daily basis, there is no guarantee Mr. Hopper and Mr. Bowling's classifications would have raised any eyebrows. Moreover, while the record is limited on this issue, it appears classifications were reviewed with some regularity, even if not daily. [R. 188-4 at 14.] To this point, the record does not reflect that misclassification was an ongoing and widespread issue—Mr. Reece has not pointed to any other instance in which inmates were harmed because other inmates were misclassified.

These issues aside, Mr. Reece's line of argument has another important missing link. To find that the alleged misclassifications caused the assault, the Court would also have to speculate that if the two allegedly misclassified inmates were not in the cell, the assault would not have occurred—in other words, if Mr. Hopper and Mr. Bowling were in another cell, Mr. Carey would have been unsuccessful in prompting the assault. Again, the Court declines to draw this conclusion. The record reflects that Mr. Reece was assaulted by seven willing participants at the direction of Mr. Carey. [*See* R. 155-1 at 6 (citing R. 155-7) ("At the time Carey recruited Hopper, he admitted observing at least five other inmates listening to their conversation, and when he walked away, he believed multiple inmates would assault Reece.").]

For these reasons, the evidence provided by Mr. Reece fails to establish a genuine issue of material fact as to whether there was an "affirmative link" between alleged failure to regularly review inmate classifications and the assault on Mr. Reece. As such, the Court grants summary judgment to Mr. Waits and Shelby County on the "failure to train and supervise" claim.

45

### C

The Court turns next to the Southern Defendants' and Shelby County Defendants' motions for summary judgment as to Mr. Reece's state law claims.  First, Southern Defendants' motion.

### 1

### a

First, Southern Defendants argue the seven individual providers "are protected from liability by qualified official immunity and are entitled to judgment as a matter of law."  [R. 152-1 at 9.]  Defendants argue each provider was acting in his or her official capacity and performing discretionary functions in providing care to Mr. Reece.  [*Id.* at 9–23 (relying heavily on *Jerauld*, 353 S.W.3d 636); *see also* R. 224 at 4–5.]  As a threshold matter, however, it is unclear whether the Southern Defendants, as non-governmental actors, are entitled to immunity under Kentucky law.

Fortunately, while this issue has not been definitively settled by Kentucky courts, recent persuasive case law offers direct guidance.  In *Rice v. Montgomery Cty., Kentucky*, a pretrial detainee brought similar § 1983 and state law claims against Southern and the individual medical providers employed by Southern.  No. CV 5:14-181-KKC, 2016 WL 2596035, at *1 (E.D. Ky. May 5, 2016).  There, the court rejected the individual medical providers' argument that they were entitled to qualified official immunity.  *Id.* at 18.  First, the court explained that Southern itself was not entitled to qualified official immunity as a corporate entity.  *Id.* (citing *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 749 (6th Cir. 2015)).  Next, relying on a decision from the Kentucky Court of Appeals, the court concluded that "[i]f Southern does not have immunity, neither do the nurses it employs."  *Id.* (citing *Sietsema v. Adams*, No. 2013-CA-001159, 2015

46

WL 4776304 (Ky. App. August 14, 2015), *rev'd on other grounds*, *Adams v. Sietsema*, 533 S.W.3d 172 (Ky. 2017)).  The Court agrees with this conclusion.

In *Sietsema v. Adams*, the Kentucky Court of Appeals engaged in a lengthy and thorough analysis to determine whether individual Southern medical providers were entitled to qualified official immunity under Kentucky law.  2015 WL 4776304, at *5–8.  In concluding that they were not, the court found significant that Southern did not act as an "alter ego" of the county in performing its services because it was "a private corporation that operates in twelve different states."  *Id.* at *8.  The court also noted that "Kentucky and [f]ederal case law find that an independent contractor who performs services for the government is liable for his own negligence and is "responsible just as he would be on private work."[21]  *Id.* (citing various cases in support of this proposition).  While not binding, like the *Rice* court, this Court finds the *Sietsema* court's thoughtful analysis of Kentucky law persuasive.  The individual Southern Defendants are not entitled to qualified official immunity.

**b**

The individual Southern Defendants also argue they are entitled to summary judgment on the merits of Mr. Reece's negligence claims, as set forth in Count II.  [R. 224 at 3.]  On this claim, it is important to note that Southern Defendants are correct in stating that, although Mr. Reece named three different types of negligence in his Complaint, in reality, he sets forth a claim for medical negligence against the individual medical providers.  *See id.* ("Negligence in the provision of medical care and 'professional negligence' by medical providers are one and the

---

[21] Notably, the *Sietsema* court convincingly dismissed the argument that *Jerauld v. Kroger*, a Kentucky Supreme Court case which Defendants rely on heavily [*see* R. 152-1 at 9–23], answered the question of whether independent medical providers were entitled to qualified official immunity.  *Sietsema*, 2015 WL 4776304, at *5.

same.").  Review of the Complaint and Mr. Reece's briefing indicates he seeks to hold the medical providers liable for their alleged negligence in providing proper care, nothing else.[22] [*See* R. 1 at 16; R. 225 at 6–8.]

For negligence to be established in a medical malpractice action in Kentucky, a plaintiff must establish the following elements: (1) standard of care recognized by the medical community as applicable to the particular defendant, (2) breach of the standard of care, (3) proximate causation, and (4) injury.  *Heavrin v. Jones*, No. 2002-CA-000016-MR, 2003 WL 21673958, at *1 (Ky. Ct. App. July 18, 2003); *see also Baylis v. Loudes Hospital, Inc.*, 805 S.W.2d 122, 124) (Ky. 1991).  Generally, in a medical malpractice action, the burden of proof is on the plaintiff to establish each element by way of expert testimony.  *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010) (citation omitted); *see also Blair v. GEICO Gen. Ins. Co.*, 917 F. Supp. 2d 647, 657 (E.D. Ky. 2013).

**i**

First, Southern Defendants argue Dr. Waldridge is entitled to summary judgment as Mr. Reece's only medical expert, Nurse Dahring, is unqualified to testify concerning Dr. Waldridge's alleged negligence.  [R. 224 at 4.]  Notably, the Court has already excluded the portion of Nurse Dahring's testimony concerning Dr. Waldridge's alleged negligence.  [R. 207 at 12.]  And it appears Mr. Reece does not dispute that Dr. Waldridge is entitled to summary judgment on this claim—his supplemental response focuses solely on whether the individual nurses were negligent.  [*See* R. 182-1 at 41.]  As such, the Court grants summary judgment to Dr. Waldridge as to Count II.

---

[22] Whether Mr. Reece has stated legitimate claims for gross negligence will be considered following an initial determination of whether his underlying negligence claims can survive summary judgment.

### ii

A similar holding is warranted as to the negligence claim against RN Lowe.  Although neither party acknowledges as much in their supplemental briefing, the Court has excluded testimony from Nurse Dahring as to Ms. Lowe's alleged negligence.  [R. 207 at 7–10.]  So, as Nurse Dahring is Mr. Reece's only medical expert, Mr. Reece has necessarily failed to provide the requisite expert testimony to necessary to succeed on this claim.  *See Blankenship*, 302 S.W.3d at 675.   The Court grants summary judgment to RN Lowe as to Count II.

### iii

Southern Defendants next argue that summary judgment is proper on the negligence claims as to the remaining medical providers: PA Coleman, APRN Jensen, LPNs Newton, Neal, and McClain and RN Lowe.  [R. 224.]  To restate, the moving party has the initial burden of demonstrating the basis for its motion and identifying the parts of the record that establish absence of a genuine issue of material fact.  *Hall Holding*, 285 F.3d at 424.  The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.

On review of Southern Defendants' initial summary judgment motion, the Court found that they had failed to meet their initial burden on certain claims, negligence included, and provided an additional opportunity to address the propriety of summary judgment.  [*See* R. 222.] In their supplemental memorandum, Southern Defendants argue these remaining Defendants are entitled to summary judgment because (1) Mr. Reece has failed to establish a deviation from the standard of care by way of expert testimony and (2) has also failed to establish proximate causation by way of expert testimony.  [R. 224 at 3–5.]  But Southern Defendants' arguments on these issues are inexact and incomplete.  In large part, they have failed to carry their initial

burden and, consequently, the remaining medical providers are entitled to summary judgment on the negligence claims only in part.

The Court turns first to Defendants' standard of care argument.  In a footnote in Southern Defendants supplemental brief, they state that "[f]or the reasons stated in the Southern Defendants' brief in chief, they also maintain that Plaintiff has also failed to establish a deviation from the standard of care.  [R. 224 at 4 n. 2 (citing R. 152 at "sec. II 1-7.").]  To start, it is not immediately clear which portion of their "brief in chief" Southern Defendants rely on—Section II of the brief directly addresses deliberate indifference as relevant to the § 1983 claims and covers more than thirty pages.  [*See* R. 152-1 at 23–57.]  To be sure, in arguing for summary judgment on the § 1983 claims against them, Southern Defendants reference the applicable standard of care.  [*See* R. 152-1 at 15, 16; *see also id.* at 60 ("Plaintiff's claim for deliberate indifference against Defendants . . . fail for lack of verifying medical evidence and that same lack of proof dooms his claims of medical malpractice against them.").]  But in both their initial brief and their supplemental brief, Southern Defendants fail to set forth any developed analysis or argument concerning the negligence elements as applied to the facts of this case.

The Court declines to sift through arguments made addressing entirely different claims to extract and apply the portions that are relevant to the present claims.  As previously noted in this case, "it is not for the Court to search the record and construct arguments.  Parties must do that for themselves."  *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017) (citing *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x. 442, 449 (6th Cir. 2008)).  The remaining Southern Defendants are not entitled to summary judgment on the standard of care ground.

Southern Defendants' causation argument is a different matter.   Initially, Southern Defendants correctly note that, on causation, a plaintiff must ordinarily produce expert evidence

50

in a medical malpractice case to survive summary judgment. [R. 224 at 3 (citing *Turner v. Reynolds*, 559 S.W.2d 740 S.W.2d 741-42 (Ky. App. 1977).] Based on this general rule, Southern Defendants argue they are entitled to summary judgment as "[w]ith respect to Defendants Coleman, Jensen, Lowe, Neal, Newton, and McClain. Plaintiff cannot identify any resulting injury to the Plaintiff." *Id.* at 4; *see also id.* ("Given that Plaintiff is unable to establish causation of any injury, his claims must be dismissed.").

Southern Defendants' argument applying the general rule is well taken. In Kentucky, however, an exception to this rule exists in "situations in which causation is so apparent that laymen with a general knowledge would have no difficulty in recognizing it." *Lacefield v. LG Elecs., Inc.*, No. CIV-A. 3:06-12-KKC, 2008 WL 544472, at *3 (E.D. Ky. Feb. 26, 2008) (citing *Jarboe v. Harting,* 397 S.W.2d 775, 778 (Ky. 1965)). In these situations, "circumstantial evidence may be sufficient to prove causation where the evidence reasonably establishes a causal connection between the alleged negligence and the injury." *Garrison v. Sam's E., Inc.*, No. 1:16-CV-00152-GNS-HBB, 2019 WL 3535991, at *2 (W.D. Ky. Aug. 2, 2019) (citing *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991)).

In his initial response brief and his supplemental brief, Mr. Reece cites to this exception and argues that expert testimony is not required to prove causation in this case. [R. 183 at 33; R. 225 at 7–8.] Here, Mr. Reece relies largely on *Garrison v. Sam's E., Inc.*, a case in which the court found expert testimony was not necessary to prove a causal link between a plaintiff's fall and subsequent pain and suffering. 2019 WL 3535991, at *3 ("Jurors do not need a medical degree to find that falling results in pain, so Plaintiff does not need expert testimony on this particular question."). Mr. Reece argues that, similarly, jurors may not need expert testimony to conclude that facial fractures that went untreated for thirty days might result in pain. [R. 225 at

8.]  The Court agrees—at this stage, it would be premature to grant summary judgment on Mr.

Reece's claim that Southern Defendants' negligence caused him pain and suffering.  But pain

and suffering are not the only alleged damages Mr. Reece seeks as part of his claim.

In his Complaint, Mr. Reece also seeks actual damages for loss of income following his

injuries.  [R. 1 at ¶ 58.]  Here, Southern Defendants are entitled to summary judgment.  Mr.

Reece has provided almost no argument or evidence concerning his alleged lost income.  In both

his initial response brief and his supplemental brief, he focuses solely on pain and suffering.

[*See* R. 225 ("[T]he layperson exception applies in this case and thus Reece was not required to

offer expert testimony on whether the pain he suffered was the result of his untreated facial

fractures.)."]  So, as to these damages, it would be speculative conclude that "causation is so

apparent that laymen with a general knowledge would have no difficulty in recognizing it."

*Lacefield*, 2008 WL 544472, at *3.  Notably, other courts have made similar distinctions between

damages sought as part of a negligence claim.  Indeed, in *Garrison*, the case Mr. Reece relies on

so heavily, the court found that defendants were entitled to summary judgment on lost earnings

and medical expenses, even though summary judgment was inappropriate on the pain and

suffering portion of the claim.  2019 WL 3535991, at *3.

PA Coleman, APRN Jensen, LPNs Newton, Neal, and McClain and RN Lowe are

entitled to partial summary judgment on Mr. Reece's gross negligence and negligence claims, a

set forth in Count II.  Specifically, Mr. Reece's claims for damages relating to loss of income

will be dismissed, but his claim for pain and suffering will remain.

### c

Southern Defendants also initially failed to address the intentional infliction of emotional

distress claim set forth in Count III, as against "all individual Defendants and [Southern]."  [R. 1

at 17.]  As with the negligence claims, the Court provided Southern Defendants an additional opportunity to address the IIED claims in their supplemental memorandum and they did so, arguing the individual Defendants and Southern itself were entitled to judgment as a matter of law.  [R. 224 at 5.]  In response, Mr. Reece agreed to dismiss the claims.  [R. 225 at 1 n. 1.]  Accordingly, the Court grants summary judgment to the Southern Defendants as to Count III.

### 2

Shelby County Defendants also seek summary judgment on all state law claims against them.  As above, the Court will consider whether summary judgment is proper on these claims as to each of the moving Defendants.

### a

First, Defendant Shelby County, Kentucky argues that the negligence claim against it is barred by sovereign immunity.  [*See* R. 156-1 at 32.]  However, Count II of Mr. Reece's Complaint, which includes Mr. Reece's negligence claims, is only brought against "all individual Defendants and [Southern]," not Shelby County itself.  [R. 1 at 16.]  And Mr. Reece, in his response, does not contest that Shelby County is entitled to sovereign immunity on these claims.  This established, the Court finds that Mr. Reece did not bring a gross negligence or negligence claim against Shelby County and denies this portion of the motion for summary judgment as moot.

### b

As against the Shelby County Defendants, Mr. Reece sues Defendants Waits and Bailey in their individual capacities for negligence.  [R. 1 at ¶ 48.]  Based on his response to Shelby County Defendants' motion for summary judgment, it appears Mr. Reece alleges Mr. Waits and Ms. Bailey were negligent for failing to ensure Mr. Reece was classified as a minimum security and housed in the proper cell with other minimum security inmates.  [R. 182-1 at 45.]

Defendants argue these negligence claims fail for two separate reasons: (1) Waits and Bailey are entitled to qualified immunity, and (2) the claims fail on their merits.

**i**

Under Kentucky law, qualified immunity protects public officers sued in their individual capacities from "damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis,* 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity is to apply to claims against officers in their individual capacity if they were (1) performing a discretionary function, (2) in good faith, and (3) within the scope of their authority. *Id.* Such immunity is not available for the "negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.*

So, as to both Ms. Bailey and Mr. Waits, the threshold question for purposes of the qualified immunity inquiry is whether the acts they performed in classifying and housing inmates amounted to discretionary or ministerial acts. First, Ms. Bailey's role will be considered. As noted when considering the § 1983 claims against her, Ms. Bailey was a deputy jailer who often completed the initial booking for inmates. [R. 188-3 at 15.] Mr. Reece alleges that Ms. Bailey "had a ministerial duty to enforce the known rule of housing inmates in the cell with the least number of inmates and which contains other similarly classified inmates." [23] But this is an oversimplification. On review, classification of inmates at booking was discretionary in nature and Ms. Bailey is entitled to qualified immunity.

True, it was well-settled in the Shelby County jail that deputy jailers were to classify inmates as either minimum, medium, or maximum security at booking to ensure inmate and staff

---

[23] Notably, Mr. Reece does not contest that classification of inmates was within the scope of Defendants' authority, nor does he attempt to provide facts demonstrating that either Defendant acted in bad faith.

safety.  [R. 188-4 at 13.]  But, necessarily, this process required deputy jailers to make a judgment call on how the new inmate should be classified, after considering a variety of factors.  *See id.* at 12–13.  Indeed, the record reflects that, at booking, Ms. Bailey classified Mr. Reece and other inmates based on various objective criteria.  [R. 188-3 at 16; R. 188-4 at 12–13.]  Clearly, this was a discretionary act.  Consequently, Ms. Bailey is entitled to qualified immunity unless Mr. Reece can show she acted in bad faith or that this function was outside the scope of her authority.  *Yanero*, 65 S.W.3d at 523 ("Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.").  Mr. Reece has failed to introduce any evidence to this effect and, as such, Ms. Bailey is entitled to qualified immunity on the negligence claim.  The Court grants summary judgment to Ms. Bailey as to Count II.

### ii

The negligence claim against Mr. Waits requires closer consideration.  Here, like with certain of the § 1983 claims against Mr. Waits, Mr. Reece takes issue with Mr. Waits' failure to ensure inmate classifications and housing assignments, including those completed by Ms. Bailey, were reviewed daily.  *See supra* Section II.B.6.b.ii.  So, a different standard applies but the same alleged shortcoming is at issue.  Like Ms. Bailey, Mr. Waits argues he is entitled to qualified official immunity and, like Ms. Bailey, the threshold question is whether Mr. Waits' acts were discretionary or ministerial.

Mr. Reece argues that Mr. Waits' duty to ensure inmate classifications were proper was ministerial in nature.  [R. 182-1 at 45.]  And, here, Mr. Reece's argument carries more weight.  Mr. Reece cites to Shelby County Jail Policy 5-100 which states: "The Jailer of [sic] his designee shall review all classification assignments daily."  *Id.* (citing R. 188-2).  Based on the plain

language of Jail Policy 5-100, Mr. Waits had an absolute and certain duty to review

classifications.  As such, the Court finds that the duty at issue was ministerial, not discretionary,

in nature.  Mr. Waits is not entitled to qualified official immunity.

### iii

So, next, the Court turns to whether Mr. Waits is entitled to summary judgment on the

merits of Mr. Reece's negligence claim against him.  To prevail on a claim of negligence, a

plaintiff must prove "(1) a duty of care owed by the defendant, (2) conduct constituting a breach

of that duty, (3) resultant injury and (4) causation between the breach and the injury."  *Lewis v. B*

*& R Corp.,* 56 S.W.3d 432, 436–37 (Ky. App. 2001).  In the correctional setting, Kentucky law

"imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent

unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in

failing to prevent what he could not reasonably anticipate." *Rowan Cty. v. Sloas*, 201 S.W.3d

469, 478 (Ky. 2006) (quoting *Lamb v. Clark*, 138 S.W.2d 350, 352 (Ky. 1940) (internal

quotations omitted)).  Ordinarily, the "duty of ordinary care to prevent [harm] arises only upon

the discovery of some fact which would lead a reasonable person to believe there is some

likelihood of . . . injury." *Id.* at 479 (citation omitted).  "Kentucky courts look to the general

foreseeability of harm, not to whether the particular, precise form of injury could be foreseen." *T*

*& M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526, 531 (Ky. 2006).

Mr. Reece's claims fall short of establishing Mr. Waits had a duty to prevent the harm

that occurred.  It is undisputed that Mr. Waits had a general duty to exercise diligence in

preventing unlawful injury to Mr. Waits, a detainee in his custody.  But Kentucky law requires a

more specific inquiry to determine whether a duty of care existed as to the negligence at issue.

The question is whether there was the discovery of some fact that would make the harm that befell Mr. Reece generally foreseeable.

Even drawing all reasonable inferences in Mr. Reece's favor, he has failed to show that the November 19 assault was reasonably foreseeable.  As noted at length, the assault on Mr. Reece occurred because Mr. Carey solicited Mr. Hopper and other inmates [*see* R. 182-1 at 13], and any conclusion that the assault would have occurred without Mr. Carey's involvement is unfounded and speculative.  Relatedly, any conclusion that such an assault was reasonably foreseeable to Mr. Waits is similarly suspect.  Mr. Reece has not pointed the Court to any other prior incident that was substantially similar to this assault that may have alerted Mr. Waits to the possibility that fellow inmates would viciously assault Mr. Reece.  Indeed, Mr. Reece fails to provide any helpful argument on this threshold issue.  [*See* R. 182-1 at 46–47.]

As part of this reasonable foreseeability inquiry, Kentucky courts also look to whether the injury that occurred was "within the natural range of effect of the alleged negligent act . . . ."  *T & M Jewelry*, 189 S.W.3d at 531.  Viewed through this lens, it remains that Mr. Reece has failed to establish the assault was reasonably foreseeable.  Plainly, an assault by seven inmates on a fellow inmate as orchestrated by a deputy jailer is not "within the natural range of effect" of a failure to regularly review inmate classifications.  *Id.*

Mr. Reece has failed to point to any evidence indicating that the assault on Mr. Reece was reasonably foreseeable to Mr. Waits.  Consequently, his negligence claim fails and the Court grants summary judgment to Mr. Waits as to Count II.

**c**

Finally, Shelby County Defendants also move for summary judgment on Mr. Reece's intentional infliction of emotional distress claim, as set forth in Count III.  [R. 156-1 at 40–41.]

Defendants argue the claim should be dismissed because it is a "gap-filler" claim and Mr. Reece "has an adequate recourse to recover damages for physical or emotional distress under his federal constitutional claim and other state law claims." *Id.* Mr. Reece fails to offer any responsive argument on this claim. [*See* R. 182-1.] Consequently, the Court will grant summary judgment to Shelby County Defendants on Count III. *See McPherson*, 125 F.3d at 995–96.

### D

The Court has now resolved the Shelby County Defendants' and Southern Defendants' motions for summary judgment and turns to Mr. Reece's summary judgment motion concerning his claims against Defendant Carey. Mr. Reece has four remaining claims against Mr. Carey: (1) a Fourteenth Amendment excessive force claim, actionable under 42 U.S.C. § 1983 (Count I); (2) negligence and gross negligence claims (Count II); (3) an intentional infliction of emotional distress claim (Count III); and (4) a conspiracy to violate constitutional rights claim under 42 U.S.C. § 1985 (Count IV). [R. 1 at ¶¶ 34, 48, 52, 55.] Now, Mr. Reece moves for summary judgment on "all claims" against Mr. Carey but fails to even acknowledge the conspiracy claim in his briefing. [*See* R. 155-1 at 25.] Consequently, the Court will address only whether summary judgment is proper on Mr. Reece's first three claims against Mr. Carey.

Before proceeding to the individual claims, however, one threshold issue must be resolved: whether Mr. Carey's guilty plea in his federal criminal case before this Court is admissible evidence for purposes of this civil suit. Mr. Reece believes it is admissible and that the admissions within that plea "result in judicial and collateral estoppel barring [Carey] from disputing the material facts necessary to establish liability against him on each of Reece's claims." *Id.* at 11. Mr. Carey, on the other hand, in his June 9 response brief, argues that the guilty plea is not admissible because it "is still capable of withdrawal . . . ." [R. 179 at 5.] The

58

passage of time has resolved the initial question of whether the guilty plea is admissible: On August 17, this Court sentenced Mr. Carey to four years imprisonment, following the acceptance of his guilty plea.  [R. 7; R. 10; R. 41, *Carey*, 3:19-cr-00026-GFVT.]  Thus, the plea is no longer capable of being withdrawn and Mr. Carey's arguments on this issue are moot.  This established, the question remains whether "judicial and collateral estoppel" are proper as to each claim.

### 1

The doctrine of judicial estoppel prevents a party from "(1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'"  *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (citation omitted).  Three factors typically inform whether judicial estoppel applies: (1) a party's later position must be "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a court to accept the party's earlier position; and (3) whether the party advancing the inconsistent position would gain an unfair advantage if allowed to proceed with the argument.  *New Hampshire v. Maine*, 532 U.S at 750–51 (citations omitted).  Notably, the doctrine "is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement."  *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir. 1990).

### a

Mr. Reece first argues the doctrine applies to bar Mr. Carey from denying liability as to the Fourteenth Amendment excessive force claim.  [R. 155-1 at 12.]  To succeed on an excessive force claim under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley*, 576 U.S. at 396–97; *see also Guy v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 687 F. App'x

471, 474 (6th Cir. 2017).  A court is to make the objective reasonableness determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time . . . ." *Kingsley*, 576 U.S. at 397 (citation omitted).  Additionally, a court must account for "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal citations and quotations omitted) (alteration in original).

The Court finds that Mr. Carey is barred from denying liability on this claim, based on the admissions in his prior guilty plea.  In relevant part, Mr. Carey admitted to the following: "The Defendant directed Inmate C.H. to assault J.R., purposely setting into motion an assault that resulted in serious bodily injury."  [R. 155-11 at 3.]  And Mr. Carey admitted that, in doing so, he willfully deprived Mr. Reece of his constitutional right "to be free from the use of unreasonable force by or at the direction of a deputy jailer." *Id.* at 1.

The first two judicial estoppel factors are clearly met.  First, any denial by Mr. Carey that he would be liable for use of excessive force would be "clearly inconsistent" with his earlier position.  Mr. Carey admitted to soliciting the assault on Mr. Reece and that, in doing so, he violated Mr. Reece's right to be free from the use of unreasonable force.[24]  Second, as noted above, Mr. Carey achieved judicial acceptance as to his earlier position when the Court sentenced him following the acceptance of the guilty plea. *New Hampshire v. Maine*, 532 U.S at 750–51.  In the present context, the third factor—unfair advantage—is inapplicable.

---

[24] Of course, asking inmates to assault another inmate in an attempt to seek retribution for previously dating one's wife is certainly an objectively unreasonable use of force.

The Court is mindful that the judicial estoppel doctrine is to be applied with caution but, in this case, there is no concern with impinging on the "truth-seeking function" of the Court. *Teledyne Indus.*, 911 F.2d at 1218.  The relevant facts are well established and Mr. Carey admits they could be proven "beyond a reasonable doubt."  [R. 155-11 at 2.]  Notably, other courts have applied the doctrine in similar circumstances and prevented § 1983 litigants from taking positions that would be contrary to the factual basis of a prior guilty plea.  *See, e.g.*, *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996); *Lovett v. Lucas*, No. 1:08-CV-1253, 2012 WL 13171308, at *19 (N.D. Ohio Jan. 4, 2012), *aff'd sub nom., Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014).  The Court grants Mr. Reece summary judgment on his Fourteenth Amendment excessive force claim against Mr. Carey.

**b**

Mr. Reece also argues that judicial estoppel applies to prevent Mr. Carey from denying liability on the negligence claim and the intentional infliction of emotional distress claim.[25]  [R. 155-1 at 24.]  For separate reasons, however, summary judgment is improper on these claims.

**i**

In the excessive force context, courts have noted that "[w]hen an officer uses more force than is necessary, he commits an intentional act. . . . Thus, when an officer uses excessive force, he can be liable for the intentional tort of battery, but he cannot be liable for negligence."  *See Durmov v. Univ. of Kentucky*, No. CIV. 5:12-258, 2013 WL 488976, at *2 (E.D. Ky. Feb. 7, 2013) (citing *Ali v. City of Louisville,* No. 3:05–CV–427–R, 2006 WL 2663018, at *8 (W.D. Ky. 2006)).  Here, in the plea agreement that Mr. Reece relies on, Mr. Carey admits to committing an

---

[25] Notably, Mr. Reece fails to include any argument as to his gross negligence claim against Mr. Carey. Thus, the Court finds that Mr. Reece has waived his gross negligence claims against Mr. Carey.  *See McPherson*, 125 F.3d at 995-96 (indicating issues "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" may be deemed waived).

intentional act: "Defendant directed Inmate C.H. to assault J.R., purposely setting into motion an assault that resulted in serious bodily injury." [R. 155-11 at 3.] If Mr. Reece only pointed to Mr. Carey's conduct in causing the assault, then a negligence claim would clearly be improper; but he also points to conduct that occurred *after* the assault.

In support of his negligence claim, Mr. Reece points to Mr. Carey's failure to check on Mr. Reece or provide medical care following the assault. [R. 155-1 at 24 (citing *Webb v. Jessamine County Fiscal Court*, 802 F. Supp. 2d 870, 888 (E.D. Ky. 2011).] And the plea agreement supports a finding of negligence based on Mr. Carey's conduct *after* the assault. [R. 155-11 at 2 ("[A]lthough [Mr. Carey] knew [Mr. Reece] was going to be assaulted, [he] never returned to the cell during his shift to check on [Mr. Reece] and no other deputies came by the cell until several hours later."). This, of course, is conduct separate from the conduct that forms the basis for the excessive force claim. Based on these findings, Mr. Reece states a viable negligence claim. However, he fails to provide the necessary argument or evidence to warrant summary judgment on this claim.

Under Kentucky law, to succeed on a negligence claim, a plaintiff must introduce "proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012). Arguably, Mr. Reece has provided evidence sufficient to establish the first two elements as it relates to Mr. Carey's alleged failure to provide care following the assault. However, he includes no argument relevant to this duty on the injury or proximate causation element. For example, as to the proximate causation element, Mr. Reece simply argues that his "injures were caused by Carey's failure to stop the assault." [R. 155-1 at 25.] He includes no argument concerning how his injuries were

62

caused or exacerbated by Mr. Carey's failure to check on him *after* the assault.  Consequently, Mr. Reece is not entitled to summary judgment on this claim.

### ii

Nor is Mr. Reece entitled to summary judgment on his intentional infliction of emotional distress claim.  A claim for intentional infliction of emotional distress is a "gap-filler" tort that is inappropriate where "the facts support a claim for a more traditional personal injury tort with mental pain and suffering as part of damages rather than severe emotional distress caused by outrageous conduct."  *Childers v. Geile*, 367 S.W.3d 576, 583 (Ky. 2012).  Importantly, "[t]his is not to say that it cannot be pleaded alternatively, but there can be only one recovery on a given set of facts.  *Id.* at 582; *see also Estep v. Combs*, 366 F. Supp. 3d 863, 887 (E.D. Ky. 2018).  Mr. Reece has stated a viable negligence claim and, as such, he is not entitled to summary judgment on his IIED claim at this stage.

Mr. Carey would take this ruling one step further, arguing that the IIED claim fails as a matter of law based on the existence of the more "traditional common law tort" of negligence.  [R. 179 at 6.]  That argument, however, is premature.  Mr. Reece may plead both negligence and IIED, he just may not prevail on both.  *Childers*, 367 S.W.3d at 581.  At this stage, both claims remain.

### 2

As noted, Mr. Reece moved for summary judgment on "all claims" against Mr. Carey but failed to address the conspiracy claim in his briefing.  [*See* R. 155-1 at 25.]  Given the Court's findings as to Defendant Bailey and Southern Defendants, the continued viability of this claim is questionable.  Accordingly, the parties are directed to file additional briefing.  Mr. Reece must file a supplemental brief addressing the continued viability of this claim within **seven (7) days** of the entry of this Order.  Likewise, Mr. Carey is then entitled to respond to any such filing

within **seven (7) days** of Mr. Reece's filing.  The parties' respective briefs should be **no more than four (4) pages**.

### III

There is no doubt that Mr. Reece suffered significant injuries during his stay at Shelby County Detention Center.  But not every individual that came into contact with Mr. Reece during his stay can be held liable for those injuries—as a matter of law, certain of the Defendants are entitled to dismissal.  As to whether the remaining Defendants can be held liable, that will be up to the jury to decide.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.   Southern Defendants' Motion for Summary Judgment [**R. 152**] is **GRANTED in part** and **DENIED in part**, consistent with the findings of this Order;

2.   Plaintiff Joshua Reece's Motion for Summary Judgment [**R. 155**] is **GRANTED in part** and **DENIED in part**, consistent with the findings of this Order

3.   Shelby County Defendants' Motion for Summary Judgment [**R. 156**] is **GRANTED in part** and **DENIED in part**, consistent with the findings of this Order;

4.   Plaintiff's § 1983 claims against Defendant Southern Health Partners, as set forth in Count I, are **DISMISSED**;

5.   Plaintiff's § 1983 claims against Defendants Neal, Lowe, Coleman, Jensen, and Waldridge, as set forth in Count I, are **DISMISSED**;

6.   Plaintiff's § 1983 claims against Defendant Shelby County, as set forth in Count I of the Complaint, are **DISMISSED**;

7.   Plaintiff's § 1983 claims against Defendants Waits and Bailey, as set forth in Count I of the Complaint, are **DISMISSED**;

8.   Plaintiff's § 1983 claims against Defendants Newton and McClain, as set forth in Count I of the Complaint, remain;

9.   Plaintiff's negligence claims against Defendants Waldridge and Neal, as set forth in Count II of the Complaint, are **DISMISSED**;

10.   Plaintiff's negligence claims against Defendants Coleman, Jensen, Newton, Neal, McClain and Lowe, as set forth in Count II of the Complaint, will be dismissed in part and retained in part.  Specifically, Mr. Reece's claims for damages relating to loss of income will be dismissed, but his claim for pain and suffering will remain;

11.   Plaintiff's negligence claims against Defendants Waits and Bailey, as set forth in Count II of the Complaint, are **DISMISSED**;

12.   Plaintiff's intentional infliction of emotional distress claims against all Southern and Shelby County Defendants, as set forth in Count III of the Complaint, are **DISMISSED**;

13.   Plaintiff's 42 U.S.C. § 1985 conspiracy claims against all Southern and Shelby County Defendants, as set forth in Count IV of the Complaint, are **DISMISSED**;

14.   Plaintiff is entitled to partial summary judgment on his § 1983 claim against Defendant Carey, as set forth in Count I of the Complaint.  The issue of damages remains outstanding;

15.   Plaintiff's negligence and intentional infliction of emotional distress claims against Defendant Carey, as set forth in Counts II and III of the Complaint, remain;

16.   Plaintiff may refile to address the 42 U.S.C. § 1985 conspiracy claim against Defendant Carey, consistent with the directives of this Order;

17.     Shelby County Defendants' Motion for Leave to File Excess Pages [**R. 195**] is **GRANTED**;

18.     Plaintiff's Motion for Leave to File a Response to Southern Defendants' Motion in Limine [**R. 227**] is **GRANTED**; and

19.     Plaintiff and Southern Defendants' Joint Motion to Hold in Abeyance Ruling on Southern Defendants' Motion in Limine [**R. 228**] is **GRANTED**.


This the 17th day of March, 2021.


Gregory F. Van Tatenhove
United States District Judge